Docket No. 103522.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

JAMES GALLAGHER *et al*., Appellants, v. JAROSLAW ROBERT LENART *et al*., Appellants (Rail Terminal Services, LLC, Appellee).

*Opinion filed August 9, 2007.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Fitzgerald, Kilbride and Karmeier concurred in the judgment and opinion.

Chief Justice Thomas specially concurred, with opinion.

Justice Burke took no part in the decision.

## OPINION

Plaintiffs, James Gallagher and his wife, filed suit against defendants Jaroslaw Robert Lenart and Pacella Trucking Express, Inc., based on injuries Gallagher sustained when the truck he was operating for his employer, Rail Terminal Services, LLC, collided with the truck Lenart was operating for Pacella. After plaintiffs settled their lawsuit against defendants, Rail Terminal sought to enforce its workers' compensation lien against the settlement proceeds allocated to Gallagher (820 ILCS 305/5(b) (West 2004)). The circuit court of Cook County found that Rail Terminal had waived its lien when it settled Gallagher's workers' compensation claim. Accordingly, the

court granted defendants' motion to adjudicate third-party claims and issue settlement drafts. Rail Terminal appealed, and the appellate court reversed and remanded, holding that Rail Terminal had not waived its workers' compensation lien, and that the circuit court erred in granting defendants' motion. 367 Ill. App. 3d 293. For the reasons that follow, we affirm the judgment of the appellate court.

BACKGROUND

On April 10, 2001, James Gallagher was operating a truck for his employer, Rail Terminal Services, LLC, when his truck collided with another truck driven by Jaroslaw Robert Lenart, an employee of Pacella Trucking Express, Inc. Gallagher injured his spine as a result of the accident and was required to undergo surgery and take pain medication.

After the accident, Gallagher filed a workers' compensation claim against Rail Terminal. Initially, Rail Terminal paid him $24,903.51 in temporary total disability benefits and $53,392.21 in medical expenses. Then, on July 28, 2003, the parties settled Gallagher's claim for an additional lump-sum payment of $150,000.

The parties executed two documents as part of the settlement. The first was entitled "Illinois Industrial Commission Settlement Contract Lump Sum Petition and Order." The settlement contract provided, in relevant part:

> "Respondent [Rail Terminal] to pay the petitioner [Gallagher] $150,000.00 in full and final settlement of all claims under the Workers' Compensation Act for injuries allegedly incurred on or about April 10, 2001 and any and all results, developments or sequale [*sic*], past, present or future resulting from this accident. Respondent denies these injuries are compensable and this settlement is made to settle those issues as a purchase of the peace against any and all claims of temporary total compensation, permanent partial disability and medical, surgical [or] hospital expenses, past, present or future. Review under Sections 19(h) and 8(a) are waived by the petitioner. The settlement is made in lieu of any additional compensation beyond the date of approval of this contract and includes only payment of temporary total compensation in the

-2-

amount of $58,049.70, unpaid medical bills in the amount of $388.02, and the aforementioned purchase of the peace. Respondent is not responsible for any outstanding medical bills not submitted for payment prior to approval of this settlement contract."

The second document the parties executed was entitled "Resignation Agreement." It was contingent upon the workers' compensation arbitrator's approval of the settlement contract described above. In its recitals, the resignation agreement acknowledged that Gallagher had a pending workers' compensation claim against Rail Terminal, and that the claim was being settled. It further acknowledged that, as part of the settlement, Gallagher would voluntarily resign from his position with Rail Terminal and waive all claims arising from his employment. The agreement explained that the basis for the settlement was that Rail Terminal had "no position available within [Gallagher's] permanent restrictions." Thus, "in consideration of [Rail Terminal's] agreement to pay [Gallagher] the sum of $1.00 *** in a lump sum after an Order issued approving the settlement of [Gallagher's] workers' compensation claim," Gallagher agreed to be bound by a series of specific provisions.

First, Gallagher agreed to the sufficiency of the stated consideration. Second, Gallagher agreed that, by signing the resignation agreement, he was "voluntarily resigning his employment with [Rail Terminal]." Third, Gallagher agreed to "refrain from suing [Rail Terminal], or authorizing any complaint or suit against [Rail Terminal], on his behalf for any action of any kind or character, in law or equity, suspected or unsuspected, arising out of or related to his employment with [Rail Terminal]." Fourth, Gallagher agreed not to "seek reinstatement, future employment or return to active employment status with [Rail Terminal]." Fifth, Gallagher agreed to "release[ ] and forever discharge[ ]" Rail Terminal from any and all claims arising out of his employment with Rail Terminal, including claims based on a variety of statutes and legal theories specifically enumerated in the resignation agreement. The latter provision concluded by stating that it did "not apply to claims, if any, for which releases are prohibited by applicable law or which arise after the date that [Gallagher] executes his agreement."

The resignation agreement also contained the following clause:

"This Agreement does not constitute an admission by Employer of any liability or wrongdoing but it is intended to resolve in good faith any existing or potential disputes or claims arising out of Employee's relationship and separation with Employer."

While Gallagher's workers' compensation claim was still pending, he filed a personal injury action against defendants Lenart and Pacella in the Cook County circuit court. Gallagher sought damages for the injuries he suffered as a result of the accident. In addition, in an amended complaint, his wife raised a loss of consortium claim.

On November 20, 2003, defendants filed a third-party action against Rail Terminal seeking contribution pursuant to the Joint Tortfeasor Contribution Act (740 ILCS 100/1 *et seq.* (West 2002)). Defendants alleged that Rail Terminal failed to properly train and supervise Gallagher. Rail Terminal filed a motion for summary judgment arguing that it did not fail to train or supervise Gallagher, and that no additional training or supervision would have prevented the accident. The circuit court granted Rail Terminal's motion.

Subsequently, on September 16, 2005, defendants reached a settlement with plaintiffs. They agreed to pay Gallagher $125,000 for his personal injury claim and pay his wife $225,000 for her loss-of-consortium claim.

Shortly thereafter, Rail Terminal filed a motion to intervene in the personal injury action. It also filed a motion to set aside the allocation of the settlement proceeds and reallocate them. Rail Terminal's purpose for intervening was to assert its workers' compensation lien under section 5(b) of the Workers' Compensation Act (820 ILCS 305/5(b) (West 2004)). Section 5(b) provides, in relevant part:

"Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act. In such case, however, if the action against such other person is

-4-

brought by the injured employee *** and judgment is obtained and paid, or settlement is made with such other person, *** then from the amount received by such employee *** there shall be paid to the employer the amount of compensation paid or to be paid by him to such employee ***. ***

*** 

*** [T]he employer may have or claim a lien upon any award, judgment or fund out of which such employee might be compensated from such third party.

*** The employer may[ ] at any time [after the filing of a third-party action] join in the action upon his motion so that all orders of court after hearing and judgment shall be made for his protection." 820 ILCS 305/5(b) (West 2004).

Rail Terminal claimed its lien amounted to $228,295.72 based on the $24,903.51 it paid in temporary total disability benefits, the $53,392.21 it paid in medical expenses, and the $150,000 lump sum it paid pursuant to the settlement contract. In both of its motions, Rail Terminal stated that it did not participate in or approve of the settlement between defendants and plaintiffs. Furthermore, it claimed that plaintiffs had structured the settlement to circumvent its workers' compensation lien by allocating 64.3% of the settlement proceeds to Gallagher's wife.

On October 7, 2005, in response to Rail Terminal's motions, defendants filed a motion to adjudicate third-party claims and issue settlement drafts. They argued that language in the settlement contract between Rail Terminal and Gallagher constituted a waiver of Rail Terminal's workers' compensation lien. In support of this contention, defendants relied on *Borrowman v. Prastein*, 356 Ill. App. 3d 546 (2005), where the Fourth District of the appellate court concluded that an employer that entered into a settlement contract similar to the one between Rail Terminal and Gallagher had given up its right to assert its workers' compensation lien.

Plaintiffs joined defendants' motion and filed responses of their own to Rail Terminal's motion to intervene and its motion to reallocate the settlement proceeds. In their response to Rail Terminal's motion to intervene, plaintiffs, like defendants, relied on

*Borrowman* and argued that Rail Terminal had waived its workers' compensation lien. In addition, they pointed out that Rail Terminal received Gallagher's resignation as part of the settlement, suggesting that Rail Terminal had knowingly contracted away the lien in exchange for this concession. The response included an affidavit from plaintiffs' counsel, Jonathan Kurasch. He averred that Rail Terminal was aware of plaintiffs' personal injury action at the time it settled Gallagher's workers' compensation claim, and that, in negotiating the settlement, "no claim was ever made or reserved for continuation of [Rail Terminal's] rights" under section 5 of the Workers' Compensation Act.

In plaintiffs' response to Rail Terminal's motion to reallocate the settlement proceeds, they argued that their settlement with defendants was fairly achieved, because all interested parties had the opportunity to appear and protect their interests. They also argued that Rail Terminal's claim that the settlement funds were inappropriately allocated was speculative.

Rail Terminal, for its part, filed both a reply to plaintiffs' responses and a response to defendants' motion to adjudicate third-party claims and issue settlement drafts. Rail Terminal argued that the settlement contract contained no specific waiver of its section 5(b) workers' compensation lien. It also argued that the Fourth District's decision in *Borrowman* was distinguishable from the instant case. In addition, Rail Terminal contended that the resignation agreement did not contain a waiver of its workers' compensation lien and denied that such a waiver provided the consideration for Gallagher's resignation. With respect to the allocation of the settlement, Rail Terminal criticized plaintiffs for failing to produce any evidence in support of allocating the majority of the proceeds to Gallagher's wife.

Rail Terminal bolstered its reply and its response with affidavits from William Ryan, its counsel; Patrick Holden, a claims adjuster for Rail Terminal's workers' compensation insurer; and Michael McCabe, an employee of the third-party administrator that handled Gallagher's workers' compensation claim for Rail Terminal's workers' compensation insurer. Ryan's affidavit contained a description of the events leading up to the September 16, 2005, settlement conference between plaintiffs and defendants. Ryan averred that at the previous settlement conference on August 19,

2005, he informed the court, plaintiffs' counsel, and defendants' counsel that Rail Terminal was not prepared to waive a portion of its workers' compensation lien to facilitate a settlement between plaintiffs and defendants. Ryan further averred that at no time prior to or during the August 19, 2005, settlement conference did plaintiffs' counsel or defendants' counsel ever take the position that Rail Terminal had waived its workers' compensation lien as part of its workers' compensation settlement with Gallagher. According to Ryan, the first time that position was taken was when defendants filed their motion to adjudicate third-party claims and issue settlement drafts.

Holden's affidavit described his involvement with the settlement of Gallagher's workers' compensation claim. He averred that, prior to the settlement of that claim, he told plaintiffs' counsel that Rail Terminal would not waive its workers' compensation lien as part of the settlement. He also averred that both during the settlement negotiations and after the settlement was reached, plaintiffs' counsel acknowledged the existence of Rail Terminal's lien and indicated that Rail Terminal would recover any amounts paid in settlement of Gallagher's workers' compensation claim from subsequent civil recovery by Gallagher.

McCabe's affidavit, like Holden's, described his involvement with the settlement of Gallagher's workers' compensation claim. McCabe averred that it was not customary for Rail Terminal's workers' compensation insurer to waive an employer's right to recover its workers' compensation lien as part of negotiations for the settlement of a workers' compensation claim without the receipt of additional consideration. McCabe further stated that if such a waiver was contemplated, a provision expressly memorializing it would have been included in the settlement contract. In addition, McCabe stated that Holden had communicated with plaintiffs' counsel and indicated that Rail Terminal's workers' compensation insurer did not intend to waive Rail Terminal's workers' compensation lien as part of the settlement with Gallagher.

On December 13, 2005, the circuit court held a hearing on Rail Terminal's motion to intervene, Rail Terminal's motion to reallocate the settlement proceeds, and defendants' motion to adjudicate third-party claims and issue settlement drafts. At the hearing, the parties

reiterated the positions set forth in their respective pleadings. After considering the parties' arguments, the circuit court granted Rail Terminal's motion to intervene. It also granted defendants' motion to adjudicate third-party claims and issue settlement drafts, finding that Rail Terminal had no workers' compensation lien under *Borrowman*. The court noted that, in deciding to grant defendants' motion, it was not relying on the resignation agreement. Finally, the court denied Rail Terminal's motion to reallocate the settlement. The court reasoned that it did not need to reach the allocation issue in light of its determination that Rail Terminal had no lien.

Rail Terminal appealed, and the First District of the appellate court found in its favor, rejecting the Fourth District's analysis in *Borrowman*. 367 Ill. App. 3d at 298. The court reasoned that *Borrowman* is unsupported by case law (367 Ill. App. 3d at 298-99), contrary to several principles underlying the Workers' Compensation Act (367 Ill. App. 3d at 299-301), and at odds with general principles of contract law (367 Ill. App. 3d at 301-02). It concluded that, in this case, Rail Terminal had a valid workers' compensation lien. 367 Ill. App. 3d at 303. Accordingly, it reversed the circuit court's decision to grant defendants' motion to adjudicate third-party claims and issue settlement drafts. 367 Ill. App. 3d at 303. With respect to Rail Terminal's motion to reallocate settlement proceeds, the appellate court declined to address the merits of the motion for the first time on appeal and remanded the cause to the circuit court for consideration of the allocation issue. 367 Ill. App. 3d at 303.

Plaintiffs filed a petition for leave to appeal (210 Ill. 2d R. 315), which we allowed to address the conflict between *Borrowman* and the appellate court's decision in the instant case.

## ANALYSIS

### I

This case requires us to consider the meaning of contract language that has received conflicting constructions from different districts of our appellate court. The construction of a contract presents a question of law. *People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223 (2006). Accordingly, our standard of review is *de novo*.

*Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

## II

As mentioned, the Fourth District addressed contract language similar to the language of the settlement contract at issue here in *Borrowman v. Prastein*, 356 Ill. App. 3d 546 (2005). In *Borrowman*, the plaintiff fractured his heel when the safety rigging he was using to paint the inside of a water tower collapsed. *Borrowman*, 356 Ill. App. 3d at 547. After an orthopedic surgeon performed surgery on the fracture, the plaintiff developed an infection in his bone, which the surgeon subsequently treated with antibiotics. *Borrowman*, 356 Ill. App. 3d at 547. Although the infection cleared, the plaintiff suffered a variety of negative side effects from the antibiotics. *Borrowman*, 356 Ill. App. 3d at 547

The plaintiff filed a workers' compensation claim against his employer. *Borrowman*, 356 Ill. App. 3d at 547. He also filed a medical malpractice lawsuit against the surgeon and a nursing association. *Borrowman*, 356 Ill. App. 3d at 547. The plaintiff settled the workers' compensation claim for $230,000 and subsequently settled the medical malpractice lawsuit for $750,000. *Borrowman*, 356 Ill. App. 3d at 547. Shortly after settling the medical malpractice lawsuit, the plaintiff moved to adjudicate the employer's claim that it was entitled to a workers' compensation lien against the plaintiff's recovery in the malpractice case. *Borrowman*, 356 Ill. App. 3d at 547. The circuit court determined that the employer was entitled to a lien of $175,973.71. *Borrowman*, 356 Ill. App. 3d at 547-48.

Both the plaintiff and the employer appealed. *Borrowman*, 356 Ill. App. 3d at 548. The plaintiff argued that the employer was not entitled to a lien at all or, alternatively, that the employer was entitled to less than the amount awarded. *Borrowman*, 356 Ill. App. 3d at 548. The employer argued that the circuit court miscalculated the lien and that it was entitled to more than the amount awarded, relying on *Robinson v. Liberty Mutual Insurance Co.*, 222 Ill. App. 3d 443 (1991), and *Kozak v. Moiduddin*, 294 Ill. App. 3d 365 (1997). *Borrowman*, 356 Ill. App. 3d at 548.

The appellate court defined the issue in the case as "whether [the employer] is entitled to a lien pursuant to section 5(b) of the [Workers' Compensation] Act [citation] when it agreed to settle its claims with [the plaintiff] knowing a medical malpractice case was pending." *Borrowman*, 356 Ill. App. 3d at 548. After discussing *Robinson* and *Kozak*, the court distinguished those cases on the grounds that, in *Robinson*, the plaintiff's workers' compensation claim was not settled, and in *Kozak*, the employer settled the plaintiff's workers' compensation claim before it knew of the plaintiff's medical malpractice lawsuit. *Borrowman*, 356 Ill. App. 3d at 550.

The court next quoted language from the settlement contract the plaintiff and the employer entered into while the plaintiff's medical malpractice lawsuit was pending:

> " 'The above constitutes a full, final[,] and complete settlement of any and all claims for temporary total disability, permanent partial and/or permanent total disability incurred or to be incurred by said [p]etitioner by reason of an industrial injury occurring on or about April 7, 1995, or by reasons of any claim or cause of action by [p]etitioner against [r]espondent of any nature whatsoever. Rights under [s]ections 8(a) and 19(h) of the *** Act are hereby waived by both parties.' " *Borrowman*, 356 Ill. App. 3d at 550.

The court observed that the settlement contract did not contain any reservation of rights or waiver of rights with regard to the plaintiff's pending medical malpractice lawsuit. *Borrowman*, 356 Ill. App. 3d at 550. The court then concluded that because the employer was aware of the medical malpractice lawsuit and made no reference to it in its "full, final[,] and complete settlement" with the plaintiff, the employer forfeited its workers' compensation lien rights. *Borrowman*, 356 Ill. App. 3d at 551. In addition, the court surmised that because the employer did not mention its claim of a potential lien in the settlement contract, the lien was not an issue in the negotiations that led to the settlement. *Borrowman*, 356 Ill. App. 3d at 551. Accordingly, the court reasoned that to hold that the employer was entitled to a lien would "completely nullify both parties' good-faith dealings." *Borrowman*, 356 Ill. App. 3d at 551. In light of these considerations, the appellate court held that the employer "should be

bound by the terms of its agreement and is not entitled to a section 5(b) lien on the malpractice case." *Borrowman*, 356 Ill. App. 3d at 551. Thus, the appellate court reversed the judgment of the circuit court. *Borrowman*, 356 Ill. App. 3d at 552.

Since *Borrowman* was decided, both the First District and the Second District of the appellate court have declined to follow it. The First District rejected *Borrowman* in the instant case. The court characterized *Borrowman* as holding that "an employer forfeits or waives its workers' compensation lien by not specifically reserving it in a settlement of the employee's workers' compensation claim when the employer knew of the employee's pending claim against a third-party tortfeasor." 367 Ill. App. 3d at 298. It then offered three criticisms of this holding. 367 Ill. App. 3d at 298-302.

First, the court concluded that *Borrowman* is unsupported by case law. 367 Ill. App. 3d at 298. The court pointed out that *Borrowman* did not rely on the *Robinson* and *Kozak* cases in support of its holding, but rather distinguished those cases after the intervenor-employer cited them in support of its argument for a greater lien award. 367 Ill. App. 3d at 298. According to the court, the plaintiffs in *Robinson* and *Kozak* did not argue that the employers were not entitled to workers' compensation liens at all. 367 Ill. App. 3d at 298. Rather, in *Robinson*, the plaintiff merely disputed the amount of the lien the employer would receive, and in *Kozak*, the plaintiffs argued that the employer was judicially estopped from asserting its otherwise valid lien because it took an inconsistent position in a third-party lawsuit. 367 Ill. App. 3d at 298 (citing *Robinson*, 222 Ill. App. 3d at 446, and *Kozak*, 294 Ill. App. 3d at 367). Moreover, neither of those cases discussed a workers' compensation settlement agreement. 367 Ill. App. 3d at 298.

Second, the appellate court determined that *Borrowman* is contrary to several principles underlying the Workers' Compensation Act. 367 Ill. App. 3d at 299. The court emphasized that section 5(b) of the Act is designed to allow employers and employees to reach the true tortfeasor responsible for an employee's injuries while preventing employees from obtaining a double recovery. 367 Ill. App. 3d at 299-300. The court also noted that, under section 5(b), courts have a duty to protect an employer's workers' compensation lien. 367 Ill. App. 3d at 300. The court concluded that *Borrowman*'s holding,

-11-

which acknowledges the waiver or forfeiture of an employer's workers' compensation lien, conflicts with this scheme. 367 Ill. App. 3d at 301.

Finally, the court concluded that *Borrowman* contradicts general principles of contract law. 367 Ill. App. 3d at 301. The court noted that the agreement at issue in *Borrowman* was a settlement contract between an employer and employee that settled the employee's workers' compensation claim. 367 Ill. App. 3d at 301. The court further observed that the settlement contract did not contain any reference to the employer's workers' compensation lien and, specifically, did not include a waiver of that lien. 367 Ill. App. 3d at 302. According to the court, it was consistent with general contract principles to presume that if the employer meant to waive its statutorily created lien as part of the settlement of the employee's workers' compensation claim, it would have specifically included such a waiver in the settlement contract. 367 Ill. App. 3d at 302. *Borrowman*'s holding, concluded the court, rewrote the settlement contract by adding a provision the parties did not include. 367 Ill. App. 3d at 302. The court reasoned that the plain language of the settlement contract in *Borrowman* indicated that the parties did not intend to resolve the issue of the employer's workers' compensation lien within that settlement. 367 Ill. App. 3d at 302. Accordingly, the court criticized the *Borrowman* court for assuming, without any basis, that the contract's silence on the issue of the workers' compensation lien meant that the employer chose to waive that lien. 367 Ill. App. 3d at 302. The court added that waiver involves the voluntary and intentional relinquishment of a known right, and the absence of any reference to an employer's lien in a settlement contract, without more, cannot constitute a voluntary and intentional relinquishment of that right. 367 Ill. App. 3d at 302.

The court went on to acknowledge that employers can, and sometimes do, choose to waive their workers' compensation liens. 367 Ill. App. 3d at 302. It concluded, however, that "based upon the protections of the Act and general contract principles, such a waiver of a workers' compensation lien must be more explicitly and affirmatively stated in a settlement agreement and cannot simply be implied by a lack of any reference to that lien." 367 Ill. App. 3d at 302-03.

Based on this analysis, the court declined to follow *Borrowman*. 367 Ill. App. 3d at 303. The court noted that, in the instant case, "Rail Terminal's settlement of [Gallagher's] workers' compensation claim did not include any mention or waiver of Rail Terminal's workers' compensation lien." 367 Ill. App. 3d at 303. Thus, the court held that "Rail Terminal had a valid workers' compensation lien and *** did not waive or forfeit this lien by failing to specifically reserve it in its settlement." 367 Ill. App. 3d at 303. Accordingly, the court reversed the circuit court's decision to grant defendants' motion to adjudicate third-party claims and issue settlement drafts. 367 Ill. App. 3d at 303.

After this court granted leave to appeal in the instant case, the Second District handed down its decision in *Harder v. Kelly*, 369 Ill. App. 3d 937 (2007), which followed the approach taken by the First District in the instant case. In *Harder*, the plaintiff alleged that he was injured when his vehicle was struck from behind by a vehicle operated by an employee of the Canadian National Railroad Company (CNRC). *Harder*, 369 Ill. App. 3d at 939. The plaintiff filed a workers' compensation claim against his employer and filed a personal injury action against CNRC and its employee. *Harder*, 369 Ill. App. 3d at 939. Subsequently, he settled the workers' compensation claim. *Harder*, 369 Ill. App. 3d at 939. The settlement contract provided, in pertinent part:

> "[Employer] agrees to pay and [plaintiff] agrees to accept $16,634.25 in a lump sum in full and final settlement of all claims for compensation, medical, hospital and other expenses, past, present or future, arising out of the accident described and under the terms of the [Act]. *** Review under section 19(h) and all rights under Sections 4, 8, 16, and 19 of the Act are expressly waived by the parties hereto. It is the responsibility of [plaintiff] to satisfy the outstanding medical charges out of the proceeds of this settlement. It is not the responsibility of [employer] to satisfy any outstanding medical charges, known or unknown." *Harder*, 369 Ill. App. 3d at 939.

The plaintiff also settled his personal injury action. *Harder*, 369 Ill. App. 3d at 939.

In the wake of the plaintiff's personal injury settlement, his employer's workers' compensation insurer moved to intervene as the

employer's subrogee to enforce the employer's workers' compensation lien. *Harder*, 369 Ill. App. 3d at 939. The circuit court granted the insurer's motion to intervene. *Harder*, 369 Ill. App. 3d at 939. However, the court ruled that, pursuant to *Borrowman*, the employer had forfeited its workers' compensation lien. *Harder*, 369 Ill. App. 3d at 939. Although the circuit court expressed serious doubts about *Borrowman*'s reasoning, it concluded that, in the absence of contrary authority, it was bound by *Borrowman*. *Harder*, 369 Ill. App. 3d at 939. Therefore, the court entered an order denying the insurer's claim of a lien under section 5(b). *Harder*, 369 Ill. App. 3d at 939.

The insurer appealed, and the appellate court reversed and remanded. *Harder*, 369 Ill. App. 3d at 943. After discussing both *Borrowman* and the instant case in detail (*Harder*, 369 Ill. App. 3d at 940-43), the appellate court stated:

> "We find the reasoning in *Gallagher* persuasive and we choose to follow that decision rather than *Borrowman*. Like the court in *Gallagher*, we see no reason under the Act or general contract principles why an employer should be required to include an affirmative reservation of rights in a settlement agreement when there is nothing in the agreement otherwise suggestive of an intent to waive the right ***." *Harder*, 369 Ill. App. 3d at 943.

III

Before this court, plaintiffs urge that we construe the language of the settlement contract and the resignation agreement that the parties executed in a manner consistent with *Borrowman*. They claim that *Borrowman* correctly "accepted the general principle that general releases are intended to surrender all claims between the parties." Plaintiffs argue that the settlement contract and the resignation agreement both contain general releases by which Rail Terminal waived the right to assert its section 5(b) workers' compensation lien against Gallagher's proceeds from the personal injury settlement. According to plaintiffs, the language of the settlement contract alone constitutes a waiver of Rail Terminal's section 5(b) lien, and if there is any doubt regarding the meaning of that language, the "even more

encompassing" language of the resignation agreement clearly expresses the parties' intent to extinguish all claims between them, including Rail Terminal's claim to enforce its lien.

Plaintiffs further claim there is no need for this court to consider the affidavits presented by Rail Terminal in construing the settlement contract and the resignation agreement. They maintain that this case can be resolved based solely on the language of these documents and emphasize that neither the circuit court nor the appellate court relied on Rail Terminal's extrinsic evidence.

Finally, plaintiffs argue that construing the settlement contract and the resignation agreement as waiving Rail Terminal's right to assert its section 5(b) lien is consistent with the public policy of preventing employees who file workers' compensation claims and personal injury actions from obtaining double recovery for their injuries. Plaintiffs contend that they settled their personal injury action for less than they otherwise would have in reliance on Rail Terminal's waiver of its lien. Thus, they reason that a finding by this court that Rail Terminal waived its lien will not result in a windfall for Gallagher. Conversely, they argue that a finding that Rail Terminal did not waive its lien will actually result in a double recovery for Rail Terminal by allowing it both to recover its workers' compensation payments and retain the benefit of Gallagher's resignation.

In response, Rail Terminal asks this court to follow the approach taken by the First District in the instant case and endorsed by the Second District in *Harder*. Rail Terminal argues that the First and Second Districts correctly rejected the rationale of *Borrowman*. It criticizes *Borrowman* for ignoring the principles of contract construction and argues that, under those principles, an employer cannot waive its workers' compensation lien unless it does so explicitly. According to Rail Terminal, *Borrowman* is based on the incorrect premise that if an employer intends to preserve its lien, it must include a specific reservation of the lien in the settlement agreement. Rail Terminal points out that the settlement contract and the resignation agreement at issue in this case contain no references to a section 5(b) workers' compensation lien. It contends that, construed as a whole, it is clear the settlement contract was intended to apply to Gallagher's rights to compensation under the Workers' Compensation Act, not to Rail Terminal's lien rights. With respect to

-15-

the resignation agreement, it argues that the agreement's specific identification of claims Gallagher agreed to waive provides evidence that when Gallagher and Rail Terminal intended for there to be a waiver of a right, they clearly identified the right being waived and the party waiving it.

As further support for its position, Rail Terminal directs our attention to the affidavits of Holden and McCabe as evidence of the intent of the parties at the time they settled Gallagher's workers' compensation claim. Rail Terminal argues that these affidavits provide direct and unrefuted evidence that the parties did not intend to incorporate the waiver of Rail Terminal's workers' compensation lien into the settlement.

Lastly, Rail Terminal responds to plaintiffs' arguments regarding double recovery. It argues that if this court adopts plaintiffs' position, employees who settled workers' compensation claims with their employers under terms similar to those at issue here "will gain an unintended and unauthorized windfall" through the employers' loss of their lien rights. Rail Terminal also contends that plaintiffs have failed to cite anything in the record that supports their contentions that they accepted less favorable terms in the workers' compensation settlement and the personal injury settlement in reliance on Rail Terminal's waiver of its lien.

IV

Turning to the merits, we begin by clarifying precisely what is at issue. As mentioned, the Fourth District held in *Borrowman* that because the employer was aware of the plaintiff's medical malpractice lawsuit against the defendants at the time the employer and the plaintiff settled the plaintiff's workers' compensation claim, the employer "*forfeited* its lien rights" by failing to refer to them in its " '*full, final[,] and complete* settlement' with [the plaintiff].' " (Emphases added.) *Borrowman*, 356 Ill. App. 3d at 551. In this case, the First District summarized *Borrowman* as holding that "an employer *forfeits or waives* its workers' compensation lien by not specifically reserving it in a settlement of the employee's workers' compensation claim when the employer knew of the employee's pending claim against a third-party tortfeasor." (Emphasis added.)

-16-

367 Ill. App. 3d at 298. It then phrased its own holding in opposition to its summary of *Borrowman*'s holding: "Rail Terminal had a valid workers' compensation lien and *** did not *waive or forfeit* this lien by failing to specifically reserve it in its settlement." (Emphasis added.) 367 Ill. App. 3d at 303.

In this case, the First District used the terms "waive" and "forfeit" interchangeably, due in part to the fact that, in *Borrowman*, the Fourth District concluded that the employer forfeited its workers' compensation lien, but then referred to an affirmative statement in the settlement contract as evidence of that forfeiture. As this court has stated, "[w]aiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326 (2004). Forfeiture, strictly defined, is different from waiver, as we have noted in the criminal context. See *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005). Rather than an intentional relinquishment of a known right, forfeiture is the " 'failure to make the timely assertion of the right.' " *Blair*, 215 Ill. 2d at 444 n.2, quoting *United States v. Olano*, 507 U.S. 725, 733, 123 L. Ed. 2d 508, 519, 113 S. Ct. 1770, 1777 (1993).

We find this distinction instructive in the present case. Here, when plaintiffs argue that the relevant question is "whether the settlement (comprising the Commission contract and the resignation) constituted a general release of all claims related to the on-the-job incident," they are, in fact, asserting that Rail Terminal waived its workers' compensation lien through the language of the settlement contract and the resignation agreement. They are not arguing that Rail Terminal failed to assert its lien in a timely fashion and thereby lost its right to do so.

Indeed, for plaintiffs to argue that Rail Terminal forfeited its lien under the circumstances of this case would run contrary to the plain language of section 5(b). The third paragraph of section 5(b) provides that an employer may claim a lien on the proceeds of a third-party action, and the fourth paragraph provides that "[t]he employer may[ ] at any time [after the filing of a third-party action] join in the action upon his motion so that all orders of court after hearing and judgment shall be made for his protection." 820 ILCS 305/5(b) (West 2004). Here, Rail Terminal filed a motion to intervene in plaintiffs' action

against defendants, and the circuit court granted that motion. Thus, Rail Terminal properly asserted its lien. *Cf. Scott v. Industrial Comm'n*, 184 Ill. 2d 202, 216-17 (1998) (even where employer forfeits lien by failing to obtain lien in third-party proceeding, employer or its insurer may still make claim for credits under section 5(b) following conclusion of third-party proceeding, as lien is merely means of enforcing statutory right). Accordingly, the issue before us is not whether Rail Terminal forfeited its workers' compensation lien.

Nor is the issue before us whether it is possible for an employer to waive its workers' compensation lien. Rail Terminal does not call into question that an employer can do so. As this court has previously observed, "an employer can choose not to seek reimbursement of its workers' compensation obligation. An employer can waive the lien it holds on the worker's recovery in his personal injury action." *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 399 (1998). An employer might, for instance, waive its lien to avoid liability for contribution to the other tortfeasors allegedly responsible for an employee's injury. *LaFever*, 185 Ill. 2d at 399, citing *Lannom v. Kosco*, 158 Ill. 2d 535 (1994). It might also waive its lien to avoid paying its share of attorney fees and costs under section 5(b). *LaFever*, 185 Ill. 2d at 400.

The issue we must consider is whether, based on the language of the settlement contract and the resignation agreement, Rail Terminal waived its workers' compensation lien.

Preliminarily, we address Rail Terminal's argument that, as a procedural matter, plaintiffs have forfeited their reliance on the resignation agreement for purposes of this appeal. It is true that plaintiffs did not specifically quote the resignation agreement language on which they now rely before the circuit court or the appellate court, or in their petition for leave to appeal. In spite of this, plaintiffs have not forfeited their argument that the language in question constitutes a waiver of Rail Terminal's workers' compensation lien. Before the circuit court, plaintiffs relied primarily on the language of the settlement contract to support their position, but they also attached a copy of the resignation agreement to their response to Rail Terminal's motion to intervene and suggested that Rail Terminal knowingly contracted away its workers' compensation lien in exchange for Gallagher's resignation. Moreover, Rail Terminal specifically addressed this point in replying to plaintiffs' response to

-18-

its motion to intervene and did so again at the December 13, 2005, hearing before the circuit court. As for plaintiffs' argument before the appellate court, we note that plaintiffs were the appellees and were urging the appellate court to affirm a judgment the circuit court chose to base on its consideration of *Borrowman* and the settlement contract. It is well established that where the appellate court reverses the judgment of the circuit court, and the appellee in that court brings the case before this court as an appellant, that party may raise any issues properly presented by the record to sustain the judgment of the circuit court, even if the issues were not raised before the appellate court. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430-31 (2006). Even though the circuit court relied on its consideration of *Borrowman* and the settlement contract in granting the motion to adjudicate third-party claims and issue settlement drafts, plaintiffs properly raised the resignation agreement before the circuit court. Thus, it is inconsequential whether they made the precise argument they now ask us to consider when they were before the appellate court. Finally, with respect to plaintiffs' petition for leave to appeal, we observe that while the briefs plaintiffs submitted to this court develop their argument regarding the resignation agreement in considerably more detail than their petition, the petition did refer to the resignation agreement and argue that it placed Rail Terminal on further notice that its settlement with Gallagher was intended to be a general settlement of all claims. Thus, plaintiffs' argument regarding the resignation agreement is properly before us.

The principles that guide our analysis are familiar. The primary objective in construing a contract is to give effect to the intent of the parties. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550 (2007); *Schek v. Chicago Transit Authority*, 42 Ill. 2d 362, 364 (1969); see also *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) ("A release is a contract, and therefore is governed by contract law"). A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent. *Virginia Surety*, 224 Ill. 2d at 556; *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. *Board*

*of Trade of the City of Chicago v. Dow Jones & Co.*, 98 Ill. 2d 109, 122-23 (1983). The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself. *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 283 (1958). If the language of the contract is susceptible to more than one meaning, it is ambiguous. *Farm Credit*, 144 Ill. 2d at 447. In that case, a court may consider extrinsic evidence to ascertain the parties' intent. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288 (1990).

We further note the long-standing principle that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together. *Sandra Frocks, Inc. v. Ziff*, 397 Ill. 497, 504 (1947); see also *In re Estate of Mayfield*, 288 Ill. App. 3d 534, 541 (1997). Here, the settlement contract and the resignation agreement were executed in conjunction with one another. Indeed, the resignation agreement provides:

> "This Agreement will become effective after it is signed and the settlement contracts in the aforementioned workers' compensation claim have been approved by the Arbitrator. This Agreement is contingent upon approval of said contracts."

Accordingly, we shall consider the settlement contract and the resignation agreement with reference to one another.

Turning to the settlement contract, plaintiffs argue that the following language constitutes a waiver of Rail Terminal's section 5(b) workers' compensation lien:

> "Respondent [Rail Terminal] to pay the petitioner [Gallagher] $150,000 *in full and final settlement of all claims under the Workers' Compensation Act* for injuries allegedly incurred on or about August 10, 2001 and any and all results, developments or sequale [*sic*], past, present, or future resulting from this accident." (Emphasis added.)

Plaintiffs emphasize that the settlement contract disposes of "all claims" without restriction, in that it constitutes a "full and final settlement." Furthermore, according to plaintiffs, Rail Terminal's lien

is a "claim[ ] under the Workers' Compensation Act," and it resulted from Gallagher's "accident."

We agree that a claim to enforce a workers' compensation lien qualifies as a "claim under the Workers' Compensation Act" in the abstract. As defined by Black's Law Dictionary, "claim" can refer to any of the following:

> "1. The aggregate of operative facts giving rise to a right enforceable by a court ***. 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional ***. 3. A demand for money, property, or a legal remedy to which one asserts a right ***. 4. An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing ***." Black's Law Dictionary 264 (8th ed. 2004).

Thus, "claim" is decidedly a broad term.

A careful reading of the settlement contract, however, reveals that it specifies the claims under the Act to which it refers, and a claim to enforce a workers' compensation lien is not one of them. Plaintiffs' reading of the settlement contract ignores the sentence immediately following the sentence quoted above, to wit:

> "Respondent denies these injuries are compensable and this settlement is made to settle those issues as a purchase of the peace against any and all claims for additional temporary total compensation, permanent partial disability and medical, surgical [or] hospital expenses, past, present or future."

Construing the terms of the settlement contract as a whole, as we must (*Martindell*, 15 Ill. 2d at 283), it is readily apparent that the second sentence of the contract informs the meaning of the first. In denying that "these injuries are compensable," Rail Terminal is denying the compensability of "injuries allegedly incurred on or about August 10, 2001," the same "injuries" giving rise to the "claims under the Workers' Compensation Act" to which the settlement contract applies. The settlement contract goes on to state that "this settlement is made to settle those issues," which clearly refers to issues related to Rail Terminal's denial that the injuries are compensable. Subsequently, the contract specifies that, in settling the issues

regarding the compensability of the injuries, Rail Terminal is purchasing the peace "against any and all claims for additional temporary total compensation, permanent partial disability and medical, surgical [or] hospital expenses, past, present or future." In referring to claims for "additional" benefits, it is obvious the contract is referring to claims beyond those already made by Gallagher at the time of the settlement. Thus, the settlement contract applies to all claims by Gallagher for "temporary total compensation, permanent partial disability and medical, surgical [or] hospital expenses" based on "injuries allegedly incurred on or about August 10, 2001." It does not apply to a claim by Rail Terminal to enforce its workers' compensation lien.

Plaintiffs' argument that the "full and final settlement of all claims" language creates a general release to which we must give broad effect is similarly unavailing. Plaintiffs contend that general releases are intended to surrender all claims between the parties and terminate their relationship. They suggest that where, as here, there is no dispute that Rail Terminal, the alleged releasor, was aware of the claim it was releasing, the general release should be given effect as to that claim. In support of their argument, plaintiffs rely on this court's observation in *Farm Credit Bank of St. Louis v. Whitlock* that "where both parties were aware of an additional claim at the time of signing the release, courts have given effect to the general release language of the agreement to release that claim as well." *Farm Credit*, 144 Ill. 2d at 447, citing *Frank Rosenberg, Inc. v. Carson Pirie Scott & Co.*, 28 Ill. 2d 573, 578 (1963). See *Perschke v. Westinghouse Electric Corp.*, 111 Ill. App. 2d 23, 31 (1969); *Cwik v. Condre*, 4 Ill. App. 2d 380, 383 (1954).

We have no quarrel with the statement from *Farm Credit* on which plaintiffs rely. It is, however, inapposite here. As described above, the settlement contract is explicitly limited to the settlement of claims by Gallagher against Rail Terminal for temporary total disability benefits, permanent partial disability benefits, and medical expenses. It therefore does not contain a "general release" of the type to which this court was referring in *Farm Credit*. Indeed, "general release" is a conclusory term, and determining whether particular language constitutes a general release is entirely a matter of construing that language. See *Farm Credit*, 144 Ill. 2d at 447 (release

is contract and therefore governed by contract law, and intention of parties to contract must be determined from instrument itself).

In *Farm Credit*, for instance, the plaintiff, a bank, filed a foreclosure action against the defendants after they defaulted on the second of two loans. *Farm Credit*, 144 Ill. 2d at 444-45. The defendants raised the affirmative defense that a release agreement they entered into after the default barred the foreclosure action, which was directed at the property used to secure the first loan. *Farm Credit*, 144 Ill. 2d at 445. The circuit court granted summary judgment in favor of the defendants, and the appellate court affirmed. *Farm Credit*, 144 Ill. 2d at 445. This court reversed, holding that the release agreement was ambiguous because it was unclear, based on the language of the agreement, whether the parties intended the agreement to release the defendants from all claims or merely claims related to the second loan, in which case the plaintiff could proceed with its foreclosure action. *Farm Credit*, 144 Ill. 2d at 448. The plaintiff and the defendants were aware of claims that could arise in relation to the first loan at the time they executed the release agreement (*Farm Credit*, 144 Ill. 2d at 448), a fact that would have placed the defendant's foreclosure action within the purview of the release, and thus barred it, if the language of the agreement had unambiguously created a general release (see *Farm Credit*, 144 Ill. 2d at 447 ("where both parties were aware of an additional claim at the time of signing the release, courts have given effect to the general release language of the agreement to release that claim as well")). However, because it was unclear whether the release constituted a general release, this court concluded it was necessary to refer to extrinsic evidence to determine the parties' intent and remanded the cause for further proceedings. *Farm Credit*, 144 Ill. 2d at 448. The approach we have taken in this case to analyzing the settlement contract accords with the approach we took to analyzing the language of the agreement at issue in *Farm Credit*, only here the contract language unambiguously does not constitute a general release. *Cf. Rakowski v. Lucente*, 104 Ill. 2d 317, 323-24 (1984) (where release was "comprehensive, precise and unambiguous" and defendant knew at time he executed release that he might have basis for contribution claim, contribution claim fell within scope of release).

-23-

We further hold that, even if the language of the settlement contract did constitute a general release, it would not be sufficiently explicit to waive Rail Terminal's workers' compensation lien. Considering the integral role the workers' compensation lien plays in the workers' compensation scheme, we do not believe general language is sufficient to effect such a waiver. On the contrary, the waiver of a workers' compensation lien must be explicitly stated. Accord 367 Ill. App. 3d at 302-03 (concluding "waiver of a workers' compensation lien must be more explicitly and affirmatively stated in a settlement agreement and cannot simply be implied by a lack of any reference to that lien"). Here, the language of the settlement contract contains no mention of Rail Terminal's workers' compensation lien and therefore is not sufficiently explicit to waive the lien.

The adoption of an explicit-waiver rule in this context is consistent with this court's previous recognition in *In re Estate of Dierkes*, 191 Ill. 2d 326 (2000), that "[t]he plain language of section 5(b) shows that an employer's reimbursement of workers' compensation payments from an employee's third-party recovery is *crucial* to the workers' compensation scheme." (Emphasis added.) *Dierkes*, 191 Ill. 2d at 331. As this court explained in *Dierkes*, because an employer may be required to pay compensation to an injured employee under the Act even though the employer was without fault, section 5(b) serves the important purpose of allowing " 'both the employer and the employee an opportunity to reach the true offender while preventing the employee from obtaining a double recovery.' " *Dierkes*, 191 Ill. 2d at 331-32, quoting *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 112 (1985). In the end, " '[t]his is fair to everyone concerned: the employer, who, in a fault sense, is neutral, comes out even; the third person pays exactly the damages he or she would normally pay ***; and the employee gets a fuller reimbursement for actual damages sustained than is possible under the compensation system alone.' " *Dierkes*, 191 Ill. 2d at 332, quoting 6 A. Larson & L. Larson, Larson's Workers' Compensation Laws §110.02, at 110–3 to 110–4 (1999). This court underscored its discussion of the significance of the workers' compensation lien by reiterating that " '[i]t is of *utmost importance* that the trial court protect an employer's [workers' compensation] lien.' " (Emphasis added.)

*Dierkes*, 191 Ill. 2d at 333, quoting *Blagg v. Illinois F.W.D. Truck & Equipment Co.*, 143 Ill. 2d 188, 195 (1991).

As *Dierkes* confirms, the workers' compensation lien is deeply rooted in the overall scheme of the Workers' Compensation Act. Consequently, there must be something more than general waiver language before the lien can be considered waived. Requiring explicit waiver will ensure that a lien that is "crucial to the workers' compensation scheme" (*Dierkes*, 191 Ill. 2d at 331) and of "utmost importance" (*Dierkes*, 191 Ill. 2d at 333) will not be considered waived absent unmistakable settlement language to that effect. Such a rule will have the salutary effect of placing both the parties and the courts in workers' compensation cases on notice that a specific reference to the lien in a waiver provision is required before the lien can be deemed waived. As a result, settling parties will be less likely to expend time and money arguing over the interpretation of settlement provisions, and valuable judicial resources will be conserved.

We note it is not uncommon to require the explicit waiver of certain rights. In various other contexts, where an important statutory right is at issue, an explicit manifestation of intent is required before the right in question can be deemed waived. See, *e.g.*, *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 80-81, 142 L. Ed. 2d 361, 371, 119 S. Ct. 391, 397 (1998) (union-negotiated waiver of employees' statutory right to judicial forum for claims of employment discrimination must be "clear and unmistakable"); *Eastern Associated Coal Corp. v. Massey*, 373 F.3d 530, 533, 536-37 (4th Cir. 2004) (applying "clear and unmistakable" waiver rule set forth in *Wright*); *Forest Preserve District v. Illinois Labor Relations Board*, 369 Ill. App. 3d 733, 754 (2006) ("A party to a collective bargaining agreement may waive its rights to bargain under the [Illinois Public Labor Relations] Act where the contractual language evinces an unequivocal intent to relinquish such rights. [Citation.] However, evidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable. The language sustaining the waiver must be specific and waiver is never presumed"); *Fowler v. Boise Cascade Corp.*, 948 F.2d 49, 55 (1st Cir. 1991) (recognizing that, under Maine law, employer cannot waive statutory right to immunity from suits arising out of employees'

-25-

injuries "unless the employer explicitly makes such a waiver"); *Kendall v. U.S. Dismantling Co.*, 20 Ohio St. 3d 61, 65, 485 N.E.2d 1047, 1051 (1985) ("The statutory and constitutional immunity granted to complying employers is crucial to workers' compensation law. *** [B]efore this immunity may be considered to have been waived, the waiver must be express, and must refer specifically to this particular immunity. Although express indemnity agreements worded in general terms may suffice for other purposes, we are not inclined to construe them as effective waivers of this immunity absent a clear evocation of the parties' intent to that effect"); *Bester v. Essex Crane Rental Corp.*, 422 Pa. Super. 178, 187, 619 A.2d 304, 308 (1993) (holding that indemnification clause in contract between employer and equipment lessor did not meet statutory requirement that employer "expressly provide[ ] for" indemnification to effectuate waiver of immunity from suits by third parties). We find additional support in these decisions for requiring the explicit waiver of a workers' compensation lien.

Based on the foregoing analysis, the decision in *Borrowman* is overruled. Initially, we note the court in *Borrowman* made no attempt to apply the fundamental principles of contract construction to the settlement contract at issue in that case. Instead of giving effect to all the relevant contract language, the court focused narrowly on the declaration that the contract constituted a "full, final[,] and complete settlement." In doing so, the court overlooked that the contract straightforwardly provided for a "full, final[,] and complete settlement *of any and all claims for temporary total disability, permanent partial and/or permanent total disability*" incurred by the plaintiff by reason of his accident. (Emphasis added.) *Borrowman*, 356 Ill. App. 3d at 550. Just as the settlement contract at issue here applies only to Gallagher's claims against Rail Terminal for "additional temporary total compensation, permanent partial disability and medical, surgical [or] hospital expenses," so too was the settlement contract in *Borrowman* restricted to claims by the employee against the employer. Accord *Harder*, 369 Ill. App. 3d at 939, 943 (reversing judgment of circuit court that employer waived workers' compensation lien where settlement contract provided for "full and final settlement of all claims for compensation, medical, hospital and other expenses" arising out of the plaintiff's accident).

In addition, because the language of the settlement contract in *Borrowman* contained no mention of the employer's workers' compensation lien, that language obviously was not sufficiently explicit to waive the lien.

Our analysis cannot end here. We must also consider the effect of the language contained in the resignation agreement. Turning to that agreement, plaintiffs argue that the sixth paragraph effectuates a waiver of Rail Terminal's workers' compensation lien. Paragraph six provides:

> "This Agreement does not constitute an admission by Employer of any liability or wrongdoing but it is intended to resolve in good faith *any existing or potential disputes or claims arising out of Employee's relationship and separation with employer.*" (Emphasis added.)

Plaintiffs assert that Rail Terminal's lien qualifies as a "dispute[ ] or claim[ ]" arising out of Gallagher's relationship with Rail Terminal.

Unlike the language of the settlement contract, paragraph six of the resignation agreement expresses no limitations on the types of "disputes" and "claims" to which it refers. However, like the language of the settlement contract, it contains no specific reference to Rail Terminal's workers' compensation lien. As a result, it is not sufficiently explicit to effectuate the waiver of the lien.

In light of the foregoing, there is no need for us to refer to the extrinsic evidence presented by the parties. A court may consider extrinsic evidence to ascertain the intent of the parties to a contract if the language of the contract is ambiguous. *Quake*, 141 Ill. 2d at 288. Here, there is no ambiguity to resolve. As discussed, the settlement contract, by its own terms, waives only Gallagher's claims against Rail Terminal, and neither the settlement contract nor the resignation agreement explicitly refers to Rail Terminal's workers' compensation lien, as would be required to waive the lien.

This leaves only plaintiffs' arguments regarding the policy of preventing double recovery in workers' compensation cases. Plaintiffs first contend that they settled their personal injury action for less than they otherwise would have in reliance on Rail Terminal's waiver of its lien, so a finding that Rail Terminal waived its lien will not result in a double recovery for Gallagher. This argument rests on

a factual assertion regarding plaintiffs' basis for settling the personal injury action that is not borne out by the record. Plaintiffs' second argument regarding double recovery is that finding, as we have, that Rail Terminal did not waive its lien will result in a double recovery for Rail Terminal by allowing it both to recover its workers' compensation payments and retain the benefit of Gallagher's resignation. We note that plaintiffs' attempt to relate this argument to the policy of preventing double recovery is purely rhetorical, as that policy involves "the general principle that an *employee* is not entitled to a double recovery." (Emphasis added.) *Scott*, 184 Ill. 2d at 217. In reality, plaintiffs are merely asking us to conduct a generalized inquiry into the fairness of Gallagher's bargain with Rail Terminal, which we decline to do. Courts generally will not inquire into the adequacy of consideration for a contract. *Sta-Ru Corp. v. Mahin*, 64 Ill. 2d 330, 338 (1976). Moreover, Gallagher specifically acknowledged in the resignation agreement that a $1 payment and the approval of the settlement contract, which unambiguously did not waive Rail Terminal's workers' compensation lien, would constitute sufficient consideration for his resignation.

CONCLUSION

For the reasons expressed above, we hold that Rail Terminal did not waive its section 5(b) workers' compensation lien when it settled Gallagher's workers' compensation claim. Accordingly, we affirm the judgment of the appellate court, which reversed the circuit court's decision to grant defendants' motion to adjudicate third-party claims and issue settlement drafts and remanded the cause to the circuit court for consideration of Rail Terminal's motion to set aside and reallocate the settlement.

*Affirmed*.


JUSTICE BURKE took no part in the consideration or decision of this case.

CHIEF JUSTICE THOMAS, specially concurring:

-28-

I agree with the result reached by my colleagues in affirming the appellate court's decision in the instant case and in overruling *Borrowman v. Prastein*, 356 Ill. App. 3d 546 (2005). I also agree with the conclusion that a bright-line rule should be adopted so as to require an explicit and affirmative reference to the workers' compensation lien before it can be waived by settlement language.

I would only add that even in the absence of such a bright-line rule, I do not believe that the general language of paragraph six of the parties' resignation agreement was intended to encompass Rail Terminal's workers' compensation lien. Paragraph six provides that "*[t]his Agreement does not constitute an admission by Employer of any liability or wrongdoing* but it is intended to resolve in good faith any existing or potential disputes or claims arising out of Employee's relationship and separation with Employer." (Emphasis added.) The first clause of the above-quoted sentence suggests–like all of the other language of both agreements–that it is only concerned with claims that Gallagher may have against Rail Terminal. Although the second clause uses some broad language about "any existing or potential disputes or claims," I believe that this second clause must be read in relation to the first clause. Reading paragraph six in this way leads to the conclusion that the second clause is simply referring to claims that the employee (Gallagher) may have against the employer (Rail Terminal) and not claims that Rail Terminal may have against Gallagher, such as a workers' compensation lien. This becomes even clearer when all of the language of both documents are read together as a whole, as they must be. See *In re Estate of Mayfield*, 288 Ill. App. 3d 534, 541 (1997). All of the rights that are specifically mentioned as being waived in both documents are claims that Gallagher may have against Rail Terminal. Paragraph six reinforces this theme by stating that the agreement does not constitute an admission by the employer of any liability or wrongdoing even though it is resolving in good faith existing or potential disputes and claims. In essence, the parties intended that Gallagher receive $150,000 in immediate compensation for permanent partial disability, plus an additional $1 in consideration, in exchange for his resignation and his waiver of any claims against Rail Terminal.