FIFTH DIVISION

No. 1-09-2514

| | | |
|---|---|---|
| *In re* MARRIAGE OF PHILLIP T. KARAFOTAS,) | | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| and | ) | No. 00 D 330046 |
| | ) | |
| PAMELA G. KARAFOTAS, | ) | The Honorable |
| | ) | Samuel J. Betar, |
| Respondent-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

In this case, we consider the effect of a marital settlement agreement (the Agreement) upon the windfall profits earned from the postdivorce sale of stock from a seat on the Chicago Mercantile Exchange (CME) after its very successful initial public offering (IPO). The trial court ruled that a "sale" of the seat had not occurred, since the trading rights still existed after the husband sold 10,800 shares of stock for a total profit of nearly $2.2 million. We reverse the judgment of the trial court and enter judgment on behalf of Pamela Karafotas, who was contractually given the right to 50% of the profits from any sale of the seat owned by her former husband, Phillip Karafotas.

BACKGROUND

Phillip and Pamela were married on August 1, 1987. On April 13, 2000, Phillip and Pamela were divorced, and a judgment for dissolution of marriage (Judgment) was entered into by the circuit court of Cook County. The Judgment incorporated the Agreement entered into by

Phillip and Pamela on January 10, 2000.

At the time of the Judgment, the CME was an Illinois not-for-profit membership organization structured as a privately held nonstock entity (Old CME). Phillip was a member, or seat holder, of the Old CME. Phillip actually owned an International Monetary Market Exchange membership (IMM Membership) and a separate CME membership. Each of these memberships included trading and ownership rights.

The Agreement included two provisions addressing Phillip's two seats. First, article II, "Maintenance," provided that Phillip was to pay Pamela 45% of the combined gross rental income derived by Phillip from his IMM Membership and CME Membership until either 72 months elapsed from the date of the dissolution of their marriage or until either party died. Phillip satisfied the article II requirements by paying Pamela the required amount for the first 72 months following the dissolution of their marriage.

The next provision, article III, "Disposition of Assets," provided:

"E) Phillips's [sic] Chicago Mercantile Seats: Except as set forth herein Phillip shall retain his two seats (CME and IMM) on the Chicago Mercantile Exchange as his sole property free and clear of any interest therein by Pamela. Phillip agree[s] that in the event he dies before Pamela then upon his death, the asset known as the IMM International Monetary Market Exchange Membership, division of the CME (hereafter referred to as the IMM membership[)], will be transferred to Pamela. *** In the event th[at] Pamela dies before Phillip, Pamela'[s] estate shall have no claim to the IMM membership and it shall

remain the sole property of Phillip. If Phillip sells the IMM membership during his lifetime, Phillip agrees that he will transfer to Pamela one-half of the net sales proceeds of after taxes and customary sales expenses within thirty days of the receipt of the proceeds.

***

Pamela and Phillip wish to treat the property transfers herein as an economic severance. Upon completion of the property transfers, or entry of a Judgment of Dissolution of Marriage, each parties' assets, income from the assets and income shall be treated as that person's separate non-marital property."

The Agreement concluded:

"Mutual Waiver: Except as to the provisions contained in this Agreement, each of the parties does forever waive, release, relinquishes [*sic*] and quit claim to the other all rights of homestead, maintenance and ll other property rights and claims, including claims of tortious acts, which he or she now has or may hereafter have, *** in or to, or against the property of the other party, or his or her estate, whether now owned or hereafter acquired by such party."

*CME Demutualization and Merger Process*

The transformation of the CME from a privately held entity to a for-profit public holdings company, or the demutualization and merger process, involved a series of rather complex transactions, which we will attempt to summarize in layman's language below.

Old CME initially merged into CME Transitory Company (CME Transitory), a Delaware

nonstock company, formed as a transitional entity during the demutualization process. Old CME's membership interests, including Phillip's IMM Membership and CME Membership, were converted into equivalent interests in CME Transitory.

CME Transitory then merged with and into Chicago Mercantile Exchange, Inc. (Delaware CME), a Delaware corporation. As a consequence, the IMM Membership and CME Membership interests in CME Transitory were converted into one share of IMM Class common stock and one share of CME Class common stock in Delaware CME. CME explained in its 2000 annual report:

"CME completed its historic Demutualization on November 13, 2000, becoming the first U.S. financial exchange to demutualize by converting its membership interests into shares of common stock that can trade separately from exchange trading privileges and membership rights.

Our members– now our shareholders– benefitted because their equity ownership was unbundled from their trading privileges and other rights. When the initial transfer restrictions are completely lifted, CME shareholders will be able to buy or sell equity (Class A shares) while still retaining the Class B shares that confer CME trading rights– or vice versa. Holders of Class B shares are able to sell, lease, transfer or bequeath their trading and membership rights on the exchange, just as they did before demutualization with memberships or 'seats.'"

Delaware CME's equity interests were then recapitalized. Applicable to this case, each share of IMM class common stock in which Phillip had an interest was converted into 10,800

shares of Class A common stock and one share of Class B-2 common stock of Delaware CME. Each share of CME Class common stock was converted into 16,200 shares of Class A common stock and one share of Class B-1 common stock of Delaware CME. In essence, Phillip received a total of 27,000 shares of Class A common stock of Delaware CME, 40% (10,800 shares) of which derived from the conversion of his IMM Membership. Phillip also received one share of IMM Class B-2 common stock of Delaware CME, containing both equity and IMM trading rights.

Finally, Delaware CME merged into and became a wholly owned subsidiary of a newly formed holding company, Chicago Mercantile Exchange Holdings, Inc. (CME Holdings). Delaware CME shareholders became shareholders of CME Holdings. Phillip's 27,000 shares of Class A Delaware CME stock were converted into 27,000 shares of Class A CME Holdings stock, and Phillip received an additional 2,998 Class A shares in CME Holdings, 40% (1,199) of which derived from his IMM Membership in Old CME. CME Holdings explained in a February 24, 2003, memorandum to Class B shareholders, "As a consequence of the Demutualization and the Merger, therefore, each Old CME Membership interest is now represented by CME Holdings Class A and Class B common shares and a New Membership Interest."

By the completion of the Demutualization and merger process in December 2001, Phillip owned: 11,999 shares of Class A common stock in CME Holdings, 40% of which derived from his IMM Membership; one share of Class B-2 common stock in CME Holdings; and a new membership interest combining the nonequity portion of the Class B stock he had in Delaware

CME with a Class B-2 share in CME Holdings, which could only be traded together.

*Phillip Sold Stock*

Between June 2004 and March 2006, Phillip sold 28,000 shares of his CME Holdings Class A common stock and received $5,459,280 in total proceeds. Forty percent of these shares were derived from the sale of stock converted from his IMM Membership in Old CME, amounting $2,183,712. Accounting for the paid income taxes on the gains from the sale at the maximum long-term capital gain rate of 15%, the resulting net-after-tax proceeds amounted to $1,856,155, of which one-half would equal $928,077.50.[1] Phillip did not relinquish, exchange, convert, or sell his Class B-2 share of his new membership interest in CME Holdings.

*Pamela Petitioned the Circuit Court, then Filed This Appeal*

Pamela petitioned the court to enforce her right under the Judgment to receive one-half of the proceeds from any sale of Phillip's IMM Membership interest, claiming that the Class A stock Phillip sold represented a part of his original IMM Membership interest, to which she was entitled under the Agreement. Phillip countered that since he still retained the IMM Membership through his Class B-2 share, there was no "sale" of that membership within the meaning of the Agreement.

On October 15, 2008, Pamela filed a motion for summary judgment. In her motion, she asked the court to rule, as a mater of law, that she was entitled to 50% of the net proceeds from

---

[1]These computations are set forth by Pamela in her brief on appeal and match those she has asserted throughout the legal process. Phillip has never contested these amounts and does not do so now.

the sale of stock which represented Phillip's IMM Membership in Old CME. On June 29, 2009, the court entered two orders denying Pamela's motion for summary judgment. The court found that there was no genuine issue of material fact and that Pamela was not entitled to judgment as a matter of law. The court ruled as a matter of law that no sale had occurred regarding Phillip's IMM Membership for purposes of the Agreement. On September 8, 2009, the court entered a final order denying Pamela's petition to enforce judgment.

On September 21, 2009, Pamela filed a timely notice of appeal. Pamela contends on appeal that her motion for summary judgment should have been granted because 40% of the Class A stock which Phillip sold derived from the exchange/conversion of his IMM Membership into stock in CME Holdings. While Pamela acknowledges that Phillip did not sell his entire IMM Membership and that Phillip still retains trading rights under an IMM Membership with the same membership number (No. 602), Pamela argues that it is undeniable that Phillip's original IMM Membership was exchanged for stock, and the Class A stock which Phillip sold represented a substantial portion of the original IMM Membership in question. Pamela requests that this court reverse the circuit court's order denying her petition to enforce judgment and find that Pamela is entitled to summary judgment in the amount of $928,077.50. Phillip responds on appeal that the Agreement is unambiguous and that because he still owns IMM Membership No. 602 and its trading rights, Pamela has no right to share in the proceeds from the stock sale and no current rights to the trading rights of that membership.

ANALYSIS

The central issue on appeal is whether, pursuant to the Agreement, Pamela was entitled to 50% of the net sale proceeds of Phillip's Class A common stock in CME Holdings where that stock derived from Phillip's IMM Membership. We review the circuit court's denial of Pamela's motion for summary judgment *de novo*. *Adams v. Northern Illinois Co.*, 211 Ill. 2d 32, 43 (2004). Similarly, the interpretation of a marital settlement agreement comprises a question of law which we review *de novo*. *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009).

The parties agree that the material facts surrounding the Agreement are not in dispute. Instead, they simply disagree with the single issue of whether their intent is being frustrated by Phillip's refusal to pay his ex-wife 50% of the after-tax and expenses portion of his sale of the stock. Accordingly, our analysis focuses on the meaning of the language used in the Agreement itself by applying ordinary rules of contract interpretation. See *In re Marriage of Velasquez*, 295 Ill. App. 3d 350, 356 (1998).

The primary objective in interpreting a contract is to give effect to the intent of the parties at the time they entered into the agreement. *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008). A court must first look to the language of the contract alone, "as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "Where the language of the agreement is clear and its meaning is unambiguous, courts must give effect to that language." *Schurtz*, 382 Ill. App. 3d at 1125. A contract is not ambiguous simply because the parties disagree as to the meaning of a

term or provision. See *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007). A contract should be given a fair and reasonable interpretation based on the consideration of all its language and provisions. *Velasquez*, 295 Ill. App. 3d at 356. The intent of the parties is not to be determined from detached portions of a contract or from any clause standing by itself. *Gallagher*, 226 Ill. 2d at 233.

Pamela contends that the clear intent of the parties was that she would receive 50% of the value of the IMM Membership if Phillip sold it during her lifetime or 100% of its value if he predeceased her. The circuit court essentially ruled that a "sale" of the IMM Membership did not occur because the Class B-2 common share, which confers the trading rights to the owner, is still owned by Phillip. Pamela argues that the trial court's interpretation of the Agreement is unduly strict and arbitrary, in light of the fact that Phillip sold all 1,800 shares of the Class A stock (earning over $2 million in the process ) which he received as a result of his ownership of the IMM seat when the CME had its IPO. We agree.

Turning to the merits of the case *sub judice*, it is clear to us from our reading of the terms of the Agreement that there was a definable sale of a substantial portion of the IMM Membership. To us, any other interpretation would be the product of a rather strained and arbitrary point of view, because not only was there "a" sale, there were numerous "sales" of the shares of the Class A stock, which were sold on the public market through the New York Stock Exchange, which resulted in more than $2 million to Phillip.

The fact that the Class B-2 share of stock, which confers the trading rights of the IMM

Membership, is still registered to Phillip in no way changes the undeniable reality that he deprived his ex-wife of her rightful share by refusing to pay her part of the windfall that he acquired by ownership of the seat. Further, the fact that Phillip owned this seat prior to his marriage is also largely irrelevant, because Phillip chose to utilize this arguably nonmarital asset as both a vehicle to fund his maintenance obligation (for 72 months), but also to confer a contingent benefit upon his ex-wife should one of two events (sale or his predeceasing his ex-wife) occur.

Phillip essentially argues that only he should be the beneficiary of the transformation of the IMM Membership from a unitary entity into a hybrid entity. This transformation, however, was accomplished by the CME itself and its action is the only agency which allowed Phillip to earn the profits in question. Phillip goes to great lengths to argue that his ex-wife knew that she would never be entitled to stock and that any talk of stock was "off the table," but the Agreement is wholly silent on this issue. If Phillip's argument and deposition testimony were completely accurate, it would seem that it would have been reflected to some extent in the Agreement itself.

As of the time of the Agreement, the CME's IPO was not an accomplished fact, but both parties were aware that it was a distinct possibility, not that either could have accurately predicted the hybrid approach referred to above or the enormous windfall that would be conferred upon the timely sale of the Class A stock. If Phillip's argument were correct, a single sentence in the Agreement to the effect that nothing in the language in the Agreement should be construed to mean that Pamela would ever be entitled to proceeds from stock sales would have been an easy and enforceable way to communicate any such intent. Phillip is the party who utilized this

nonmarital asset as a vehicle for providing agreed maintenance for six years. He could have avoided any potential ambiguity that might occur because of the incipient IPO by not tying his maintenance obligation to this asset.

The continued existence of IMM Membership No. 602 does not operate to negate the possible sale of the equity within the seat, because it is clear that the overall value of the seat has been diluted by millions of dollars. Allowing Phillip to sell the stock portion of the currently constituted seat while blithely maintaining that no sale had occurred since the Class B-2 share is still vested in his name strikes us as sophistry. Only an unrealistic and hypertechnical construction of the meaning of "sale" would allow Phillip to prevail under these facts. In fact, it is nigh impossible to reconstruct the intent of the parties into a form that would support Phillip's argument. In order to say that Phillip's argument supports the parties' intent at the time of the contract, one would have to accept that: (1) the parties knew that demutualization was going to occur; (2) the demutualization would effectively mutate the unitary seat into a hybrid vehicle that would allow sale of substantial equity in the seat through publicly traded stock; (3) Pamela would maintain rights in the Class B-2 share and the trading rights, but not in any publicly traded stock; and (4) only Phillip would be entitled to enjoy the potential windfall from the sale of the Class A stock. The language of the Agreement leads us to the conclusion that the parties did not want to limit or expand their respective rights in any way as a result of the then-upcoming demutualization and merger of the CME and its potential effect on the IMM Membership.

On the other hand, the plain language of the agreement inexorably lends itself to the

conclusion that Pamela is entitled to 50% of the proceeds of the sale of the stock that Phillip obtained as a result of the transfiguration of the IMM Membership after the very successful IPO. The language of the Agreement makes it clear that Pamela has several ways to benefit from the IMM Membership. First, she obtained 72 months of monthly maintenance tied to the lease value of the trading rights to the seat. Second, she would get a 100% right to the seat if Phillip predeceased her and third, she would get 50% of the value from any sale of the seat that occurred during her lifetime. Under the plain and ordinary meaning of the word "sale," it is obvious that Phillip sold a substantial portion of the seat, even if he scrupulously maintained the seat's trading rights and membership number.

Accordingly, we conclude, that pursuant to the Agreement, Phillip is required to pay Pamela 50% of the net-after-tax proceeds he received from the sale of the Class A stock he acquired in exchange for his IMM Membership, amounting to $928,077.50. Because there are no genuine issues of material fact, Pamela is entitled to judgment in her favor as a matter of law.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court denying Pamela's motion for summary judgment and her petition to enforce judgment. Pursuant to Supreme Court Rule 366, we grant Pamela's motion for summary judgment as a matter of law and award her $928,077.50 pursuant to her petition to enforce judgment. 155 Ill. 2d R. 366.

Reversed.

HOWSE, J., concurs.

JUSTICE FITZGERALD SMITH, dissenting:

I respectfully dissent from the majority's opinion in this matter.

I agree with the statement of facts contained herein. As the trial court found and the parties concede, there are no genuine issues of material fact. I also agree that the issue presented focuses on the Agreement entered into between the parties at the time of the dissolution of their marriage, and that our analysis must center on the meaning of the contractual language they chose in dealing with Phillip's IMM Membership.

However, this is where my agreement with the majority ends, for two reasons. First, it is my view that there has not been a sale of the IMM Membership which would trigger Pamela's right to proceeds therefrom. Second, even if Phillip did "sell" a portion of the IMM Membership when he sold the Class A stock he received during the demutualization and merger, I conclude that the Agreement, which I agree is unambiguous, would not provide the avenue for recovery Pamela insists it does in light of the circumstances presented and well-established contract law.

I begin with my primary conclusion that the trial court was correct in its determination that there has not been a sale of the IMM Membership. When Phillip purchased the Membership, CME assigned him IMM Membership No. 602. The record demonstrates that Phillip still owns this, as confirmed in CME's associate director of shareholder relations and membership services Robert Krewer's letter dated April 5, 2007. As this letter, written long after the demutualization and merger process, states, Phillip still "owns [IMM] membership #602 at the Chicago Mercantile Exchange Inc."

13

1-09-2514

In addition to Krewer's letter, the CME Rulebook, present in the record, contains a section entitled "Membership Rules." These Rules dictate a certain, specific process that must be followed by CME members, including Phillip, who wish to sell their memberships. As revised in 2008--again, long after the demutualization and merger process--the Rules mandate that a membership "may only be sold as provided for in the Rules"; the sale can only begin when the member signs and files an "Offer to Sell" with the membership services department, and this Offer must contain "the price at which he is offering his membership, and *** an agreement to the conditions of the sale." The Rules make clear that, "[u]pon the sale of a membership, any and all membership privileges *** shall terminate." Clearly, then, we are not solely dealing, as the majority states, with "the plain and ordinary meaning of the word 'sale' "; there are, instead, these Rules that must be considered. Slip op. at 12. And, there is nothing in the record, and neither party suggests, that Phillip completed, or even commenced with, this required process to sell the IMM Membership. He never signed or filed an Offer to Sell, as required by the Rules, to begin a sale. Moreover, as noted in Krewer's letter and as agreed to by the parties, Phillip still enjoys membership privileges he obtained when he purchased the IMM Membership--privileges which, according to the Rules, would terminate upon a sale. Based on these clear facts, I simply cannot find that a sale of the Membership occurred here. Accordingly, without a sale, the Agreement's provision entitling Pamela to one-half of the proceeds has not (yet) been triggered.

Even if a sale had taken place, I still could not agree with the majority that Pamela is entitled to one-half of what Phillip recovered pursuant to the Agreement.

14

The reasoning for my conclusion begins and ends with a proposition that everyone can agree with: assuming that a sale occurred, Phillip sold only part of the IMM Membership. That is, even though he sold the Class A stock, he retained (and still owns) the Class B stock and the New Membership Interest. In fact, the majority acknowledges as much when it states that "there was a definable sale of a substantial *portion* of the IMM Membership." (Emphasis added.) Slip op. at 19.

However, the Agreement does not deal with a partial sale of the Membership. And, as it is this instrument that controls, I cannot find that its provision entitling Pamela to one-half can be applied in light of the circumstances here.

Just as the majority notes, our main objective is to give effect to the intentions of the parties at the time they entered into the Agreement. See Blum v. Koster, 235 Ill. 2d 21, 33 (2009). However, we further note that where, as here, the agreement at issue is unambiguous, we must look to its language--and only its language--to determine this intent. See In re Marriage of Turrell, 335 Ill. App. 3d 297, 305 (2002) ("[w]hen the terms are unambiguous, the court determines the parties' intent solely from the language of the instrument"); In re Marriage of Druss, 226 Ill. App. 3d 470, 475 (1992). This is because we are to assume that the parties inserted each term and provision deliberately and for a specific purpose, and these may not be construed in a manner which is contrary to or different from the plain and obvious meaning of the language used. See Marriage of Turrell, 335 Ill. App. 3d at 305. Nor may we judge the wisdom of the Agreement's provisions to which the parties agreed. See Marriage of Druss, 226 Ill. App.

1-09-2514

3d at 475.

Significantly, we cannot alter, change or modify the Agreement's terms, add new terms or conditions to which the parties did not assent, write into the contract a provision they omitted or take away a provision they included. See Gallagher v. Lenart, 367 Ill. App. 3d 293, 301 (2006). When a contract purports on its face to be a complete expression of the agreement between the parties, we cannot add a term or provision about which it is silent, especially if it is one that could easily have been included by the parties themselves, and even if it would make the outcome more equitable. See Gallagher, 367 Ill. App. 3d at 301-02; Miner v. Fashion Enterprises, Inc., 342 Ill. App. 3d 405, 417 (2003).

Apart from the provision in the Agreement dealing with maintenance, only Article III, paragraph E, addressed Phillip's IMM Membership. It plainly states that he is to retain it "free and clear of any interest therein by Pamela"; the only conditions precedent which would vest a right in the Membership in Pamela are Phillip's death (as long as it is before hers), and if Phillip "sells the [Membership]" during his lifetime. This provision speaks only in absolutes--for Pamela to have an interest in the Membership, Phillip must predecease her (upon which she will receive the whole Membership) or he must sell the Membership (upon which she will receive one-half of the proceeds). This provision does not provide for the event of the sale of a "portion" of the Membership, substantial or otherwise; words to the effect of a "partial sale," which Pamela and the majority assert occurred, are simply not included here. Nor does the Agreement address the division of stock or anything else derived from the Membership. Instead, under the Agreement,

16

Pamela's right to one-half of the proceeds from a sale of the Membership are dependent upon just that: the sale of the Membership, and not a part or portion of it.

My conclusion is further supported by other provisions of the Agreement itself, which the majority, too, recognizes must be considered as a whole. Article III, the only to deal specifically with the IMM Membership, concludes by stating that Pamela and Phillip wish to treat the property transfers in the Agreement, including the Membership, as "economic severance." In other words, once they divorced and property was transferred, "each parties' [*sic*] assets, income from the assets and income" was now to "be treated as that person's separate non-marital property." As I believe that Phillip did not sell the Membership, I find that it remains his asset which, according to this provision of the Agreement, is to be treated as his nonmarital property separate from any right Pamela may have which will be triggered (only) when (and if) Phillip sells it.

Furthermore, the Agreement states that Pamela and Phillip "forever waive, release, relinquishes [*sic*] and quit claim to the other all rights of homestead, maintenance and all other property ***which he or she now has or may hereafter have *** in or to, or against the property of the other party, or his or her estate, whether now owned or hereafter acquired by such party." Pamela and Phillip also made clear that the Agreement comprised the "entire agreement" between them, and that it was to be final and non modifiable. Again, neither the Class A stock, nor the sale of a portion of the Membership (which the Class A stock may represent), was dealt with in the Agreement. Therefore, the proceeds Phillip received from selling the Class A stock comprised

property he acquired, or derived, after the Agreement's execution and the parties' divorce. As such, Pamela has agreed to forever waive and relinquish any right she may have in this property pursuant to the very Agreement she signed.

From our review of the Agreement as a whole, we find that the intentions of the parties regarding the Membership upon their divorce are easily decipherable from the language they chose to use: Phillip was to pay Pamela maintenance from the Membership's rental income for the first 72 months (which he did), and he was to give her one-half of any proceeds he received if and when he sold the Membership during his lifetime; otherwise, he was to retain this Membership as his sole property free and clear of any interest on her part, it was to be considered his separate property after the divorce, and she waived any property right he would acquire from it. Phillip has yet to sell the Membership; rather, he sold only a portion of it which he acquired after the divorce. The Agreement never mentioned the sale of a portion of the Membership; it speaks only to what is to occur when Phillip "sells" the Membership--not a portion of it, not a fractional interest in it, nothing less than the whole. This is the language the parties chose to use and they are bound by it, free from our judgment regarding its wisdom.

Finally, the majority asserts that, had Phillip really intended to prevent Pamela from ever receiving the proceeds from stock sales involving the IMM Membership, he would have included a sentence in the Agreement to this effect. While this may be true, I do not find it to be a proper determinative consideration on the part of this court. First, as I noted earlier, we cannot alter, change or modify the Agreement and, particularly, we cannot write into it a provision that the

parties omitted or upon which they were silent, especially if it was one the parties could have easily included but chose not to, even if it would provide for a more equitable outcome. Just as the majority believes it was Phillip's duty to include such language in the Agreement, I posit that it was Pamela's duty to secure, in a more clear and enforceable way, her claimed one-half interest. As a seat holder herself, Pamela knew at the time she signed the Agreement, just as Phillip, that changes to the IMM Membership were on the horizon. She, easily, could have anticipated that a provision would be required to deal more specifically with the Membership, but she, just as Phillip, chose not to include one in the Agreement. The critical difference, however, is that it is Pamela, and not Phillip, who is seeking to enforce an alleged interest under that very Agreement.

Ultimately, Pamela's rights to the Membership are limited by the terms of the Agreement, for which the parties voluntarily bargained. These are clear that until Phillip predeceases Pamela or until he sells the Membership, Pamela is not entitled to anything Phillip may derive from the Membership, which was explicitly reserved to him as his sole property free and clear of any interest she may have. As Phillip has not died nor sold this asset, he still retains ownership of Membership #602 and none of the conditions precedent have occurred which would trigger Pamela's rights regarding the Membership pursuant to the Agreement.

Accordingly, for these reasons, and in contrast to the majority here, I would affirm the judgment of the trial court.

| Please Use Following Form: | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT |
|---|---|
| | (Front Sheet to be Attached to Each Case) |

| Complete TITLE of Case | *In re* MARRIAGE OF PHILLIP T. KARAFOTAS, ) |
|---|---|
| | ) |
| | Petitioner-Appellee, ) |
| | and ) |
| | PAMELA G. KARAFOTAS, ) |
| | Respondent-Appellant. ) |

No. 1-09-2514

| Docket No. | Appellate Court of Illinois |
|---|---|
| COURT | First District, FIFTH Division |
| | June 18, 2010 |
| Opinion Filed | (Give month, day and year) |

| JUSTICES | ~~JUSTICE LAVIN delivered the opinion of the court:~~ |
|---|---|
| | Howse, J., concurs |
| | Fitzgerald Smith, J., dissenting. |

Lower Court and Trial Judge(s) in form indicated in the margin:

APPEAL from the Circuit Ct. of Cook County, Domestic Relations Div.

The Honorable Samuel J. Betar, Judge Presiding.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.

For APPELLANTS, John Doe, of Chicago.

Attorneys for Petitioner/Appellee:
Phillip Karafotas

Joel J. Bellows, Christopher L. Gallinari, Leslie P. Poole
Bellows and Bellows, P.C.
209 S. LaSalle St., Suite 800
Chicago, IL 60604
312.332.3340

For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)

Attorneys for **Respondent-Appellant:**
Pamela Karafotas

Howard A. London
Alan J. Greiman, Of Counsel
Beermann Swerdlove LLP
161 N. Clark St., Suite 2600
Chicago, IL 60601
312.621.9700

Also add attorneys for third-party appellants or appellees.