2023 IL App (1st) 221804
No. 1-22-1804

FIRST DIVISION
_____November 27, 2023

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____


| | | |
|---|---|---|
| OVERLAND BOND & INVESTMENT CORPORATION, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | Nos. 21-M1-108114 and 21-M1-108128 (Consolidated) |
| TRACEY CALHOUN, | ) ) | |
| Defendant-Appellee. | ) ) ) ) | The Honorable John A. Simon, Judge Presiding. |
| _____ | ) | |
| OVERLAND BOND & INVESTMENT CORPORATION, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | |
| VENANCIO J. OROZCO, JR., | ) ) | |
| Defendant-Appellee. | ) ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1     In this interlocutory appeal under Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), plaintiff-appellant Overland Bond & Investment Corp. (Overland) appeals from the circuit court order denying its motion to compel arbitration with respect to the counterclaims asserted against it by defendants-appellees Tracey Calhoun and Venancio J. Orozco, Jr. (defendants). For the following reasons, we agree with the trial court that Overland exercised its contractual choice to litigate the relevant disputes against defendants and that its choice to litigate extends to defendants' counterclaims. Thus, we affirm.

¶ 2                                      I. BACKGROUND

¶ 3     Although this interlocutory appeal centers on interpretation of an arbitration provision, the underlying lawsuits arise from defendants' alleged default of their payment obligations under automobile sales contracts. Defendants Calhoun and Orozco entered into separate retail installment contracts for the purchase of automobiles with Car Credit Center Corp. (Car Credit), an affiliate of Overland. Both contracts were subsequently assigned to Overland.

¶ 4     Relevant to this appeal, both contracts contained an identical arbitration provision that consisted of nine separate enumerated sections. Section 1 provided that by entering into the contract, the automobile buyer "agree[s] to all Sections of this Arbitration Provision." Section 2 set forth the scope of the arbitration provision as follows:

> "SECTION 2. MATTERS SUBJECT TO ARBITRATION. Any
> and all arbitrable claims and counterclaims, except as provided
> below in Section 3 of this Arbitration Provision, relating to any
> aspect of this Contract or any relationship arising out of this

Contract (including, to the full extent permitted by law, relationships with third-parties who are not signatories to this Contract or Arbitration Provision), shall be resolved by final and binding arbitration."

¶ 5 In turn, section 3 provided:

"SECTION 3. EXCLUSIONS AND LIMITATIONS. Seller [Car Credit] and its assignee [Overland] reserve under this Arbitration Provision their right to choose between arbitration and other legal or equitable proceedings (such as an action commenced in a court of law) for the resolution of their disputes arising out of this Contract and buyer's default thereunder, including collection of any amounts due thereunder. In addition, to the extent permitted by law, Buyer may not be able to participate as either a representative or member of a class of claimants, and there is expressly no authority for any claims or counterclaims to be arbitrated on a class action basis."

¶ 6 A. Overland Sues Defendants and Defendants File Counterclaims

¶ 7 On April 19, 2021, Overland filed two complaints initiating separate lawsuits against Calhoun and Orozco for failing to make payments due under their contracts. In those complaints, Overland pleaded that it had "performed all of the conditions and duties on [its] part" and that defendants breached the contracts through nonpayment. Overland sought judgments against defendants in the amount of unpaid balances due under the contracts, plus reasonable attorney's fees and costs.

¶ 8        Calhoun filed her answer, affirmative defense, and counterclaims on November 3, 2021. Orozco filed his answer, affirmative defenses, and counterclaims on March 22, 2022. In these pleadings, both Calhoun and Orozco asserted that Overland used a starter interrupter device, also known as a "kill switch," to remotely disable the vehicles they purchased. They alleged that by doing so, Overland unlawfully constructively repossessed defendants' vehicles. Both Calhoun and Orozco pleaded as an affirmative defense that Overland's use of a kill switch violated section 9-610 of the Uniform Commercial Code (UCC) (810 ILCS 5/9-610 (West 2022)), insofar as it requires a secured party to sell or dispose of collateral in a "commercially reasonable" manner after default.[1] Both Calhoun and Orozco also pleaded a counterclaim premised on this violation of the UCC, in conjunction with the Motor Vehicle Retail Installment Sales Act (815 ILCS 375/1 *et seq.* (West 2022)).[2] Orozco additionally asserted counterclaims based on the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2022)).

¶ 9        In July 2022, defendants (who were represented by the same counsel) jointly filed a "Motion for Leave to Consolidate Cases, File an Amended Answer and Transfer Cases." In that motion, defendants sought (1) leave to consolidate their cases, (2) leave to file a single amended answer asserting class action counterclaims against both Overland and Car Credit, and (3) transfer of the action to the Chancery Division. In that motion, defendants claimed they discovered that Overland regularly used kill switches to disable their customers' vehicles "without making any

---

[1]Under section 9-610 of the UCC, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." 810 ILCS 5/9-610(a) (West 2022). "Every aspect of a disposition of collateral *** must be commercially reasonable." *Id.* § 9-610(b).

[2]The Motor Vehicle Retail Installment Sales Act provides: "Unless otherwise limited by this Act, the parties shall have the rights and remedies provided in Article 9 of the Uniform Commercial Code with respect to default and disposition and redemption of collateral." 815 ILCS 375/20 (West 2022).

effort to physically retrieve" the vehicles. They further stated that their investigation revealed that Car Credit "knew of and participated in the illegal use of the kill switch devices."

¶ 10        Defendants' motion attached a proposed consolidated answer setting forth affirmative defenses and class action counterclaims against Overland and Car Credit. In those counterclaims, defendants sought to represent Illinois consumers who bought vehicles with kill switches from Car Credit under retail installment contracts assigned to Overland. Defendants alleged that when consumers fell behind on their car payments, Car Credit and Overland unlawfully used kill switches to disable vehicles for months or years, allowing the vehicles to deteriorate and lose value. According to defendants, Overland's practice was to file suit against consumers for the entire amounts due under the contract after "rendering the collateral useless" and failing to mitigate damages through timely repossession and resale. The proposed class action counterclaims included four counts alleging that Car Credit and Overland's use of kill switches constituted unlawful repossession and an unfair business practice, violated section 9-610 of the UCC because it was not a commercially reasonable disposition of collateral, and violated the Consumer Fraud and Deceptive Business Practices Act.

¶ 11        The record reflects that the trial court granted defendants' request to consolidate their cases before deciding the remainder of the motion.

¶ 12                B. Overland's Motion to Compel Arbitration of the Counterclaims

¶ 13        On July 22, 2022 (three days after defendants' motion for leave to file the amended pleading with class action counterclaims), Overland filed a "Motion to Dismiss and Compel Arbitration or to Stay Proceedings Pending Arbitration." Relying on the language of the arbitration provision and the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2022)), Overland asked the court to compel defendants to proceed on their counterclaims in arbitration or, alternatively, to

stay all proceeding in the circuit court pending resolution of their counterclaims through arbitration.

¶ 14    Defendants' brief in opposition to the motion first argued that, by choosing to sue them in court, Overland "expressly waived" any right to resolve the counterclaims through arbitration. Defendants argued that under section 3 of the arbitration provision, Overland "had the option to arbitrate but forewent that choice in favor [of] resolving its claims in court." They argued that Overland should not be able to "forum shop just because its dispute now includes related counterclaims." Defendants maintained that, by filing suit, Overland waived "not only its right to arbitrate its affirmative claim[s]" but also defendants' counterclaims, which "relate to the same contract and arise out of the same underlying facts."

¶ 15    Defendants otherwise argued that Overland's "dilatory conduct" waived any right to arbitrate, noting Overland failed to request arbitration until 16 months after filing suit. They also claimed that Overland had ignored court-imposed deadlines to respond to their counterclaims.[3] Defendants further argued that Overland never previously indicated any intent to invoke the arbitration provision and that they were prejudiced because they had "prepared for months" for litigation. Separate from their waiver argument, defendants asserted that the arbitration provision was procedurally and substantively unconscionable, for reasons not germane to the instant interlocutory appeal.

¶ 16    In a reply brief, Overland denied any waiver, asserting it had not acted inconsistently with its right to arbitrate. Overland argued that, under section 3, it had the option to decide between litigation or arbitration, both when it initially sued defendants for nonpayment, and again when

---

[3]Defendants claimed that Overland failed to comply with orders from November 4, 2021, April 22, 2022, and June 25, 2022 directing it to respond to Calhoun's counterclaims, as well as an order directing it to respond to Orozco's counterclaims by June 15, 2022.

defendants filed counterclaims. Overland otherwise asserted that the counterclaims were subject to arbitration because they were unrelated to the collection action, citing *Liberty Chevrolet, Inc. v. Rainey*, 339 Ill. App. 3d. 949 (2003). Overland argued that the counterclaims regarding the use of kill switches "drastically altered" the nature of the litigation and that they "could not have been foreseen" by Overland. Overland otherwise maintained it had not engaged in conduct waiving the right to arbitration, pointing out that it did not answer the counterclaims or engage in discovery.

¶ 17            C. The Trial Court Denies Overland's Motion to Compel Arbitration

¶ 18        On November 3, 2022, the trial court heard argument and denied Overland's motion to compel arbitration of defendants' counterclaims. The trial court reasoned that under section 3, Overland had a single choice to either arbitrate or litigate its dispute with defendants, and that its choice to litigate its affirmative claims also applied to defendants' counterclaims:

> "[Section 3] says that the seller and the [assignee] reserve *** their right to choose between arbitration and other legal or equitable proceedings. So the clause indicates a choice between the two, and I believe that by choosing the litigation that *** Overland Bond exercised its right to choose for litigation. The concept here that Overland Bond then say[s] but we only chose to do that for what we filed and not for the matters that were raised in the counterclaim *** would be understandable, but the language of the clause says *** for the resolution of their disputes arising out of this contract. So the choice is for the resolution of disputes that arise out of the contract and the buyers' default thereunder. It's for everything."

¶ 19     The trial court further noted that it was not finding that Overland had waived the right to arbitration. Rather, the court explained that Overland had a choice to exercise a "contractual option *** and it was exercised here by the lawsuit in the court and that exercised that option under the arbitration clause *** for the entire dispute between the parties." The court found that section 3 did not give Overland the option to sue first and "then elect to arbitrate other parts of the disputes," that is, the "splitting of claims" in the dispute. The court noted that it did not need to reach any argument as to whether the arbitration provision was unconscionable because it found that Overland "exercised its choice in this case and it chose litigation."

¶ 20     After the court issued its ruling, Overland's counsel informed the court of its intent to appeal. On December 2, 2022, Overland filed a notice of interlocutory appeal pursuant to Rule 307(a)(1) from denial of its motion to compel arbitration. Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017).

¶ 21                              II. ANALYSIS

¶ 22     On appeal from the denial of its motion to compel arbitration, Overland contends that the trial court erred in construing the arbitration provision to mean that, by "choosing to file suit to collect balances due ***, Overland agreed to resolve all disputes between the parties through litigation." According to Overland, although section 3 of the arbitration provision permitted it to sue defendants for amounts due under the contracts, defendants' counterclaims remained subject to arbitration. That is, Overland maintains that defendants' counterclaims are arbitrable under Section 2, regardless of Overland's prior choice to litigate its affirmative claims against defendants pursuant to section 3. Overland urges that this interpretation follows from the "clear and unambiguous" language of the arbitration provision.

¶ 23    Alternatively, Overland contends that regardless of its contractual right to "choose to litigate its [payment] default claims against defendants," it still had the right to demand arbitration of the counterclaims because they were unrelated to Overland's affirmative claims for nonpayment. Overland avers that when it filed "simple collection suits" against defendants, it had "no idea" that defendants would file "unrelated counterclaims seeking class action status" alleging that Overland unlawfully disabled the vehicles with kill switches. Overland contends that it had the right to seek arbitration of such counterclaims because they "drastically altered" the nature of the litigation.

¶ 24    Defendants respond that the trial court correctly determined that section 3 of the arbitration provision allowed Overland a single chance to choose a forum for its "disputes arising out of this Contract," including with respect to any counterclaims. By electing to sue in court, defendants contend, Overland exercised that choice in favor of litigation. Defendants suggest that the contract could have been more narrowly worded to allow Overland to choose between litigation or arbitration for each set of "claims" or "causes of action," but the drafter of the contract did not make this distinction.

¶ 25    In a separate but related argument, defendants claim that Overland waived any right to arbitrate by electing to litigate its claims against defendants. Defendants contend that when Overland sued them, it chose to submit arbitrable issues to the circuit court, constituting waiver. Defendants otherwise suggest we should find waiver due to Overland's "dilatory conduct" in waiting until July 2022 to seek arbitration. Defendants also dispute Overland's suggestion that the counterclaims are unrelated to Overland's initial claims, arguing that they relate to the same contracts and arise out of the same underlying facts.

¶ 26    For the following reasons, we agree with the trial court that, under the arbitration provision at issue, Overland had a choice to select litigation or arbitration for any given "dispute" with defendants. When it sued defendants, Overland invoked its contractual right to litigate its disputes with defendants, which encompassed both Overland's affirmative claims and defendants' counterclaims. The contractual language could have, but did not, specify that Overland retained the right to decide whether any counterclaims in a given "dispute" would be arbitrated. Having invoked its contractual right to select litigation for the entire dispute at issue, Overland could not change course once counterclaims were filed. Thus, the trial court correctly denied Overland's motion to compel arbitration of the counterclaims.

¶ 27                                A. Standard of Review

¶ 28    *De novo* review applies to an order denying a motion to compel arbitration that was made without an evidentiary hearing and which concerns only legal issues. *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance, Inc.*, 2016 IL App (1st) 161612, ¶ 25. Further, "the scope of [an] arbitration provision presents a question of contract interpretation," which is reviewed *de novo*. *Fiala v. Bickford Senior Living Group*, *LLC*, 2015 IL App (2d) 141160, ¶ 17. Here, no evidentiary hearing was held, and the circuit court's decision was based solely on legal analysis and contractual interpretation. Thus, *de novo* review applies.

¶ 29    "A motion to compel raises a sole and narrow issue—whether there is an agreement between the parties to arbitrate the dispute at issue. [Citation.]" *Guarantee Trust Life Insurance Co.*, 2016 IL App (1st) 161612, ¶ 26. Our court has held that a three-pronged approach applies:

    "(1) if it is clear that the dispute falls within the scope of the arbitration clause or agreement, the court must compel arbitration; (2) if it is clear that the dispute does not fall within the arbitration clause or agreement, the court must deny the motion

to compel; and (3) if it unclear or ambiguous whether the dispute falls within the scope of the arbitration clause, the matter should be referred to the arbitrator to deicide arbitrability." *Id.* (citing *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443-50 (1988)).

¶ 30      "While public policy favors arbitration as a method of dispute resolution, an agreement to arbitrate is nevertheless a matter of contract." *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 29. "The terms of an agreement to arbitrate are determined using ordinary contract principles." *Id.* ¶ 30.

¶ 31      The primary objective in interpreting any contract is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). The best indication of the parties' intent is the contractual language, given its plain and ordinary meaning. *Id.* at 233. Thus, "[t]he first place a court looks to determine the parties' intent is the language of the contract, considering the whole contract, not just a provision in isolation." *Clanton*, 2023 IL 129067, ¶ 30. That is, "a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 226 Ill. 2d at 233. Arbitration agreements " 'cannot be extended by construction or implication.' " *Clanton*, 2023 IL 129067, ¶ 29 (quoting *Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 387 (1991)). In sum, the parties to an agreement " 'are bound to arbitrate only those issues which by clear language and their intentions expressed in the language show they have agreed to arbitrate.' " *Id.* (quoting *Rauh*, 143 Ill. 2d at 387).

¶ 32      With these principles in mind, we turn to the contract provisions at issue. Although the arbitration provision contains nine separate sections, this appeal centers on interpretation of Sections 2 and 3. Section 2 broadly sets forth the scope of the matters subject to arbitration, except for matters encompassed by section 3.

¶ 33    Section 2 provides:

> "SECTION 2. MATTERS SUBJECT TO ARBITRATION. Any
> and all arbitrable claims and counterclaims, except as provided
> below in Section 3 of this Arbitration Provision, relating to any
> aspect of this Contract or any relationship arising out of this
> Contract *** shall be resolved by final and binding arbitration."

¶ 34    Section 2 thus uses broad language to mandate arbitration of "any and all" claims and counterclaims "relating to any aspect of" the contracts, except as provided in section 3. In other words, any "claims and counterclaims" relating to the contracts will be subject to arbitration, unless such claims or counterclaim fall within the scope of section 3.

¶ 35    There is apparently no question that, but for the existence of section 3, *both* Overland's initial claims and defendants' counterclaims would be subject to arbitration under the broad scope of section 2. Thus, the appeal concerns application of the exception in section 3. Notably, whereas section 2 explicitly refers to "claims and counterclaims," section 3 refers to "disputes." Section 3 states, in relevant part:

> "SECTION 3. EXCLUSIONS AND LIMITATIONS. Seller [Car
> Credit] and its assignee [Overland] reserve under this Arbitration
> Provision their right to choose between arbitration and other legal or
> equitable proceedings (such as an action commenced in a court of
> law) *for the resolution of their disputes* arising out of this Contract
> and buyer's default thereunder, including collection of any amounts
> due thereunder." (Emphasis added).

¶ 36    B. Section 3 Gave Overland A Single Chance to Litigate or Arbitrate Any "Dispute"

¶ 37    In denying the motion to compel arbitration, the trial court reasoned that section 3 afforded Overland a single chance to decide whether to litigate or arbitrate its claims against defendants. The trial court concluded that, since Overland had elected to sue defendants in court, it had made its decision to litigate "everything", *i.e.*, any claims and counterclaims in the lawsuit. That is, the trial court did not interpret section 3 to give Overland the right to invoke the arbitration provision with respect to counterclaims in the same litigation that Overland initiated. Insofar as section 3 gave Overland the choice to arbitrate or litigate "their disputes", the trial court apparently interpreted "disputes" to encompass not only Overland's affirmative claims for nonpayment against defendants, but also the defendants' counterclaims later raised in the same action.

¶ 38    On appeal, Overland primarily argues that the trial court's reasoning is incorrect because "[u]nder Section 2, all counterclaims are subject to arbitration regardless of any choices made by Overland under Section 3." Overland thus urges that its decision under section 3 to exercise its right to litigate its affirmative claims against defendants had no effect on the arbitrability of defendants' counterclaims asserted in the very same lawsuit. Overland asserts that there is nothing in the arbitration provision to suggest that, once it chose to sue defendants in court, it was bound to litigate "the entire dispute between the parties."

¶ 39    Notably, Overland does not offer an explanation as to the precise meaning of the term "disputes," as used in section 3. Overland's argument implicitly assumes that, insofar as section 3 reserves Overland and Car Center's right to choose arbitration for resolution of "their disputes" arising out of a car buyer's default, that right applies only to affirmative claims for non-payment. That is, Overland suggests that defendants' counterclaims necessarily fall outside the scope of the "disputes" referenced in section 3. In other words, Overland's position is that defendants' counterclaims are *not* within the same "dispute" as its affirmative claims.

¶ 40    We are not persuaded by Overland's argument, insofar as it invites us to read into the arbitration provision an intent to apply a narrower meaning of a "dispute" than is commonly understood. First, we note that the contract does not purport to define the scope of a "dispute", *i.e.*, whether a "dispute" includes counterclaims. Moreover, as defendants point out, section 3 certainly could have been drafted more carefully to indicate the intent that Overland now ascribes to it. That is, section 3 could have been worded to explicitly state that Car Credit and Overland's option to litigate applied only to their *affirmative claims* for relief arising from non-payment, but that its choice to litigate would not extend to any counterclaims asserted in response. Notably, section 2 of the same arbitration provision specifically refers to both "claims and counterclaims." Clearly, the drafter of section 3 could have, but chose not to, delineate whether both "claims" and "counterclaims" are included in a "dispute."

¶ 41    Overland's position is that, insofar as section 3 allows Car Credit and Overland a choice to litigate "their disputes," a "dispute" is limited to Overland's affirmative claims for nonpayment, but the "dispute" does not include counterclaims in the same lawsuit. Yet the plain meaning of the term "dispute" does not support the limited interpretation that Overland ascribes to it.

¶ 42    Simply put, the term "dispute" is not generally understood to be limited to the claims of one side. Rather, a "dispute" ordinarily encompasses the entire controversy, including the claims of all parties. Merriam-Webster's primary definition of the noun "dispute" is a "verbal controversy: DEBATE," and the secondary definition is a "QUARREL." Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dispute (last visited Nov. 13, 2023) [https://perma.cc/4BJM-R458]. Legal resources similarly indicate that a dispute refers to an entire controversy, not just the assertions of one party. See Cornell Law School, https://www.law.cornell.edu/wex/dispute (last visited Nov. 13, 2023) [https://perma.cc/6K3J-

TVZ3] ("A dispute is a disagreement, argument, or controversy—often one that gives rise to a legal proceeding (such as arbitration, mediation, or a lawsuit)."); Law Dictionary, https://thelawdictionary.org/dispute/ (last visited Nov. 13, 2023) [https://perma.cc/ZHU7-XHLA] (defining "dispute" to mean "[a] conflict or controversy; a conflict of claims or rights; an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other").

¶ 43    Notably, Overland does not cite any dictionary definition, case law, or other authority to suggest that "dispute" should be understood to refer to the claim or assertion of *only one* of the parties, rather than including conflicting claims and counterclaims of *all* parties. We conclude that Overland's interpretation conflicts with the plain and commonly understood meaning of a "dispute."

¶ 44    We acknowledge, as Overland emphasized in its reply brief and at oral argument, that section 3 uses the phrase "their disputes," with the possessive pronoun "their" referring to Overland and Car Credit. Overland urges that because section 3 says Overland and Car Credit may choose litigation for "their disputes" rather than "all disputes", it cannot be read to extend to defendants' counterclaims. The problem with Overland's argument is that it assumes that the term "disputes" is interchangeable with "claims." As discussed, the plain meaning of "dispute" extends beyond the claims of a single party and encompasses the whole controversy. We must apply the plain meaning of the provision, even if Overland suggests that the intended meaning was otherwise. See *St. Paul Mercury Insurance v. Aargus Security Systems, Inc.*, 2013 IL App (1st) 120784, ¶ 59 (the best indication of the parties' intent is the "plain and ordinary meaning" of the contract language, and we will not "alter, change or modify existing terms" of a contract (internal quotation marks omitted)). Applying the plain meaning of the term "their disputes," we find the

phrase simply refers to the controversies between Overland or Car Credit and their customers, including both claims and any counterclaims.

¶ 45        Again, we note that the drafters of section 3 could have easily specified that Overland and Car Credit reserved the right to litigate their "claims" or their "causes of action" against buyers for nonpayment, rather than using the broader term "their disputes." Indeed, Overland cited a case involving such a provision in its argument before our court. See *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 236-37 (2008) (rejecting challenge to arbitration clause specifically exempting from arbitration "a cause of action or claim by Dealer to recover full payment of the purchase price" or claim involving the breach of any retail installment contract). Here, the drafters of the arbitration provision could have included language specifically excluding purchasers' "counterclaims" from the scope of section 3.[4] Had they done so, then Overland would have a much stronger argument that its election to litigate its affirmative claims for nonpayment had no effect on the arbitrability of defendants' counterclaims. Instead, the drafters of section 3— despite recognizing the distinction between "claims" and "counterclaims" in section 2—specified in section 3 that Overland could elect to litigate or arbitrate "disputes" arising from nonpayment. We think this indicates a recognition that the same "dispute" includes affirmative claims as well as responding counterclaims.

¶ 46        Applying this reasoning, we reach the same conclusion as the trial court. That is, section 3 reserved the right of Car Credit and Overland to choose to litigate any given "dispute" they had with a buyer relating to the buyer's payment default. Overland made that choice for its disputes

---

[4]We do not purport to decide whether such a clause would be legally enforceable. Rather, we point out that the drafters could have easily used different language, had they intended the more limited meaning urged by Overland in this appeal.

with defendants when it sued them in the circuit court. When defendants asserted counterclaims, those counterclaims were part of the same "disputes" that Overland initiated and elected to litigate.

¶ 47    We recognize that, in its reply brief and at oral argument, Overland referenced case law for the proposition that a counterclaim functions as an independent complaint. See *Liberty Chevrolet*, 339 Ill. App. 3d at 953 ("[L]ike a complaint, a counterclaim is a separate, independent cause of action."); *Household Finance Corp. v. Buber*, 351 Ill. App. 3d 550, 554 (2004) (recognizing that "the counterclaim is itself a complaint"). Yet the mere fact that a counterclaim is an independent pleading does not mean that it constitutes a different *dispute* from that initiated by the plaintiff's complaint. Clearly, the same dispute may encompass opposing causes of action that are pleaded in the same action. Indeed, our supreme court has "defined a counterclaim as an independent cause of action in favor of the defendant against the plaintiff, which the defendant is authorized to litigate in opposition to the plaintiff's claim *in the same action*." (Emphasis added and internal quotation marks omitted.) *Carmichael v. Union Pacific R.R. Co.*, 2019 IL 123853, ¶ 26. Simply put, opposing pleadings in the same action are part of the same overall dispute. This is true, regardless of whether Overland anticipated the precise nature of the counterclaims.

¶ 48    Moreover, we briefly note our disagreement with Overland's suggestions, in briefing and at oral argument, that the counterclaims concerning the use of kill switches should not be arbitrable because they are irrelevant to Overland's affirmative claims for failure to pay amounts due under the contracts. This is disingenuous, insofar as both the claims and counterclaims clearly arise from the same contracts, and the counterclaims stem directly from Overland's conduct in response to defendants' payment default under those contracts.

¶ 49    The counterclaims clearly allege (and Overland has not denied) that Overland used kill switches to disable the vehicles purchased by defendants, after defendants failed to make

installment payments due on the contracts at issue. The legal theory underlying the counterclaims is clearly relevant to the affirmative claims of nonpayment, insofar as they allege that Overland's use of "kill switches" constituted an unlawful remedy to defendants' payment default. As stated in defendants' pleadings, the Motor Vehicle Retail Installment Sales Act provides that the UCC governs a seller's remedies after a default under a retail installment transaction. 815 ILCS 375/20 (West 2022) ("Unless otherwise limited by this Act, the parties shall have the rights and remedies provided in Article 9 of the Uniform Commercial Code with respect to default and disposition and redemption of collateral.").

¶ 50    In turn, section 9-610 of the UCC provides that "[a]fter default, a secured party may sell *** or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." 810 ILCS 5/9-610(a) (West 2022). "Every aspect of a disposition of collateral *** must be commercially reasonable." *Id.* § 9-610(b). While a debtor is generally "liable for any deficiency that results" following the sale of the collateral, this is true only if the sale was commercially reasonable. See *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1074 (2007) (absent an agreement to the contrary, "the only defenses available to a debtor against a deficiency judgment are lack of reasonable notice of the sale and commercial unreasonableness of the sale" (internal quotation marks omitted)).

¶ 51    Defendants have raised affirmative defenses and counterclaims under the theory that use of a kill switch to deactivate a vehicle is a commercially unreasonable manner of disposition, in violation of section 9-610 of the UCC. Both Calhoun and Orozco pleaded violation of section 9-610's commercial reasonableness requirement as an affirmative defense, as well as the basis for counterclaims. Likewise, their proposed consolidated amended pleading includes, as affirmative defenses, that Overland's failure to comply with section 9-610 constitutes a "complete defense" to

Overland's claims for amounts due. And their proposed class action counterclaims are premised on the same conduct. In short, there is a clear relationship between the affirmative claims in Overland's complaints and the defendants' counterclaims. Overland initiated these actions by alleging defendants' nonpayment under their contracts. The counterclaims allege that Overland unlawfully used kill switches as a remedy for the very same alleged breaches. Overland does not persuade us that the counterclaims are unrelated.

¶ 52    As the trial court stated, Overland exercised its choice under section 3 to litigate its disputes with defendants. Overland cannot escape the consequences of that decision merely because it did not expect the precise nature of the counterclaims pleaded in the disputes that it initiated. We find that, pursuant to section 3 of the arbitration provision, Overland elected to litigate its disputes with defendants relating to their alleged failure to pay amounts due under the contracts. That choice extended to the counterclaims, which were part of the same disputes. Thus, the counterclaims fall within section 3's exception to the arbitration provision.

¶ 53    We note that, since we conclude that Overland's decision to litigate its disputes against defendants encompassed defendants' counterclaims, we need not discuss the merits of the parties' contentions as to whether Overland's conduct waived its contractual right to arbitrate the counterclaims. See *Koehler v. The Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 22 ("Although disfavored, waiver will be found where a party conducts itself in a manner inconsistent with the arbitration clause, thereby demonstrating an abandonment of that right." (Internal quotation marks omitted.)). Rather, as the trial court concluded, we simply find that Overland exercised its contractual right to litigate its disputes with defendants under section 3 and that choice also applied to the counterclaims in the same disputes.

¶ 54    C. The Authority Cited by Overland Regarding the Nature of the Counterclaims Concerns Waiver and Is Irrelevant to Its Choice to Litigate the Instant Disputes

¶ 55    We turn to Overland's remaining contention that, even if it "did not have a contractual right to choose to litigate" its claims against defendants under section 3, it "still had the right to demand arbitration of defendants' counterclaims." Overland cites precedent from the Second District for the proposition that "unrelated matters raised for the first time in a counterclaim are eligible for arbitration," citing *Liberty Chevrolet*, 339 Ill. App. 3d 949, and *Household Finance Corp.*, 351 Ill. App. 3d 550. The cited precedent is unavailing.

¶ 56    In *Liberty Chevrolet*, the plaintiff automobile dealer and the defendant purchaser entered into a contract that stated that "[a]ll disputes and controversies of every kind" arising out of the purchase "will be at the option of either party submitted to arbitration." (Internal quotation marks omitted.) 339 Ill. App. at 951. The contract further specified that either party could demand arbitration "not more than 30 days following being served with a complaint in any litigation." (Internal quotation marks omitted.) *Id.*

¶ 57    After the dealer filed a complaint for replevin against the purchaser defendant, the purchaser filed a counterclaim alleging that the dealer violated various statutes, including the Consumer Fraud and Deceptive Business Practices Act, when it induced defendant to sign the purchase contract and corresponding financing agreement. *Id.* at 950-51. The dealer then moved to compel arbitration of the counterclaim. *Id.* at 951. In the trial court, the dealer argued that even assuming that it had waived the right to arbitrate, the purchaser's "counterclaim was a substantial change of circumstances that entitled [it] to rescind its waiver." *Id.* The trial court granted the motion to compel arbitration of the counterclaim, rejecting the purchaser's argument that the dealer waived its right to arbitrate when it commenced the action. *Id.* at 952.

¶ 58      On appeal, the Second District again rejected the purchaser's waiver argument. *Id.* at 953-54 (finding "no bright-line rule" that a party waives the right to arbitrate merely by filing a complaint). Further, the court found that, "[e]ven if plaintiff initially waived its right to arbitration, the counterclaim drastically altered the nature of the litigation, and plaintiff moved promptly to resuscitate its rights under the Agreement." *Id.* at 954. In so doing, the Second District approvingly cited the reasoning of a federal case finding that, "even had the plaintiff presumptively waived its right to arbitration, the counterclaim so altered the litigation that, absent prejudice to the defendants, the plaintiff could rescind its waiver." *Id.* at 955 (citing *Design Benefit Plans, Inc. v. Enright*, 940 F. Supp. 200, 203 (N.D. Ill. 1996)).

¶ 59      Thus, the portion of *Liberty Chevrolet* relied on by Overland concerned the specific issue of whether a contractual right to arbitrate may be revived *after a waiver*. However, as the trial court explained, resolution of the instant case does not turn on a finding that Overland waived the right to arbitrate. Instead, under the plain language of the contract, Overland simply exercised its choice to litigate its disputes with defendants. As our decision does not depend upon a finding of waiver, *Liberty Chevrolet*'s discussion of how counterclaims may rescind a waiver is irrelevant.

¶ 60      Overland's reliance on *Household Finance Corp.*, 351 Ill. App. 3d 550, another waiver case, is similarly unavailing. That case involved a mortgage foreclosure action, in which the underlying loans contained an arbitration rider providing that "either party could elect to submit to binding arbitration any dispute arising from the loans." *Id.* at 551.

¶ 61      After the plaintiff mortgagee filed a foreclosure action, defendants filed a counterclaim alleging, *inter alia*, that plaintiff repeatedly provided them refinancing when it knew that they lacked sufficient income to make the monthly payments. *Id.* at 551-52. The five-count counterclaim sought rescission of the mortgages and a declaration that they were void. *Id.* at 552.

Following additional rulings and related proceedings in defendants' bankruptcy court case, the trial court granted plaintiff's motion to stay the matter pending arbitration. *Id.*

¶ 62    On appeal from that ruling, defendant contended that plaintiff waived its right to arbitrate the counterclaim. *Id.* The Second District disagreed, concluding that plaintiff "timely exercised its right to invoke arbitration." *Id.* at 554 (citing *Liberty Chevrolet* for the proposition that there is no "bright-line rule" that filing a complaint constitutes waiver). In addition, the court pointed out that the arbitration rider at issue specifically provided that the " 'use of the courts shall not constitute a waiver of the right of any party *** to submit any [c]laim to arbitration.' " *Id.*

¶ 63    Furthermore, the *Household Finance Corp.* decision noted that "defendants' counterclaim raised a number of issues significantly far afield from the issues raised in plaintiff's foreclosure complaint." *Id.* The Second District affirmed the motion to compel arbitration, after rejecting defendants' remaining contentions that plaintiff submitted arbitrable issues to the court or otherwise acted inconsistent with the right to arbitrate. *Id.* at 554-56.

¶ 64    As with *Liberty Chevrolet*, *Household Finance Corp.* is plainly irrelevant to Overland's argument, insofar as it mentioned the nature of the counterclaim only in the context of refuting the suggestion that the plaintiff waived its contractual right to arbitrate. *Id.* at 554. Neither of these Second District decisions suggests that Overland's election to litigate its "dispute" with defendants under section 3 can be ignored or rescinded simply because the nature of the counterclaims is different from what Overland anticipated. Again, our decision to affirm is not based on waiver. Rather, we agree with the trial court that Overland simply exercised its option to litigate its disputes with defendants and the "disputes" at issue encompassed the counterclaims.

¶ 65    In short, we conclude that the plain language of the arbitration provision afforded Overland a choice to litigate or arbitrate any particular "dispute." The contract could have, but did not,

specify that Overland retained a right to arbitrate any counterclaim raised in a dispute. Overland made a decision to litigate the instant disputes when it filed suit against defendants. Defendants' counterclaims were part of the same "disputes" under the plain meaning of that term. Thus, Overland must act in accordance with its contractual language and its decision to litigate the entire dispute, including the counterclaims. Its motion to compel arbitration was correctly denied.

¶ 66                                   III. CONCLUSION

¶ 67        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 68        Affirmed.

---

*Overland Bond & Investment Corp. v. Calhoun*, **2023 IL App (1st) 221804**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 21-M1-108114, 21-M1-108128; the Hon. John A. Simon, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael H. Moirano, of Moirano Gorman Kenny, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | John Bouman, Lawrence Wood, and Daniel Schneider, of Legal Action Chicago, and David J. Chizewer, William C. Meyers, and Harleen Kaur, of Goldberg Kohn Ltd., both of Chicago, for appellees. |

---